OPINION
{¶ 1} This appeal emanates from a November 21, 2005 judgment entry of the Lake County Court of Common Pleas in which the trial court granted the summary judgment motion of appellees. For the following reasons, we affirm the decision of the court below.
 {¶ 2} On January 20, 2004, Kovacic filed a complaint against appellees, city of Eastlake and Mayor Dan DiLiberto ("Mayor DiLiberto"), Eastlake Police Department and Chief of Police, John Ruth ("Chief Ruth"), Eastlake Fire Department and Chief Richard Sabo ("Chief Sabo"), Dispatcher Pat Holcomb ("Dispatcher Holcomb"), of the Eastlake Fire Department, Emergency Medical Technician ("EMT") Michael J. Kaczur ("EMT Kaczur"), of the Eastlake Fire Department, Paramedic Mark A. Walker ("Paramedic Walker"), of the Eastlake Fire Department, Paramedic Todd Harvey ("Paramedic Harvey"), of the Eastlake Fire Department, and Officer William Lewis ("Officer Lewis"), of the Eastlake Police Department. In count one of her complaint, Kovacic alleged that the actions of all appellees constituted misconduct that was willful and wanton in their treatment of her due to a failure to follow proper protocol, as well as inadequate training and/or supervision, which caused her to endure pain and suffering and other damages. In count two, Kovacic claims that the actions of appellees Dispatcher Holcomb, EMT Kaczur, EMT Walker, EMT Harvey, and Patrolman Lewis, were intentional, willful, and wanton in their treatment of her, and as a result, she suffered severe and extreme emotional and mental distress.
 {¶ 3} Appellees filed their amended answer on March 15, 2004, denying each allegation and raising their defenses and/or affirmative defenses. Discovery commenced immediately following defendants' answer.
 {¶ 4} Appellees filed their joint motion for summary judgment on January 3, 2005. Kovacic filed her brief in opposition to appellees' motion for summary judgment on February 11, 2005. Appellees attached the following evidence to their summary judgment motion: the affidavits of Paramedic Walker, Paramedic Harvey, EMT Kaczur, Officer Lewis, and Chief Ruth; the depositions of Kovacic, Gregory Engle, Charnjit S. Pabla, M.D., Maureen Fabo, and Lawrence Martin, M.D; and the affidavit of Carol Cunningham, M.D., verifying that the attached "Emergency Medical Services Pre-hospital Protocols" was an authentic document of the Lake Hospital System.
 {¶ 5} On February 3, 2006, Kovacic filed a motion to correct or supplement the record in this court with the depositions of appellees Walker, Harvey, and Lewis. We remanded to the trial court for a period of twenty days in order for it to determine if these depositions were properly part of the record and inadvertently omitted. The trial court determined that these depositions were not properly filed and not technically part of the record. However, the trial court noted that at the time the court considered appellees' motion for summary judgment, it had physical copies of the depositions, believing them to have been properly filed. Therefore, the trial court considered them in rendering its judgment and concluded that they were inadvertently omitted from the record by either error or accident. Thus, this court supplemented the record on appeal.
 {¶ 6} Upon remand, the trial court further clarified that the 9-1-1 recording was properly before it when it considered appellees' motion for summary judgment, as it was attached to Chief Ruth's affidavit, which was attached to appellees' motion. The trial court indicated that the videotape deposition of Gregory Engle, Kovacic's proposed paramedic expert, was not properly before the court, since no videotape was ever filed. The trial court did note that a transcript of the videotape deposition of Gregory Engle was filed on June 23, 2005, and was part of the record in this case. However, the court said that it was filed for the purpose of presentation to the jury at trial. Thus, the trial court stated that it did not consider it since it was not filed in support of Kovacic's brief in opposition to appellees' motion. The court clarified that it did consider the affidavit of Gregory Engle as it was attached to Kovacic's brief. We note that the deposition of Gregory Engle was taken on November 3, 2004. It was attached to appellees' motion for summary judgment, and thus we presume that the trial court did have it before it as part of the record. Thus, the following evidence was considered by the trial court when it granted appellees' motion for summary judgment.
 {¶ 7} According to documents in the case that were attached to various depositions as exhibits, including pre-hospital care reports and hospital reports, Kovacic called 9-1-1 at 22:44 on the evening of October 12, 2002. The ambulance was en route at 22:46. It arrived at the scene at 22:48. EMTs were on the scene for nine minutes and en route to the hospital at 22:57, arriving at the hospital at 23:00.
 {¶ 8} The 9-1-1 call reveals that the call was approximately forty seconds long. Three or four seconds after the call was picked up, Kovacic is heard saying "help." At seven seconds into the call, Dispatcher Holcomb states, "9-1-1, what's your emergency?" Kovacic is heard saying "help" four or five more times, with a couple of seconds between each time, with no response from Dispatcher Holcomb. At approximately twenty-nine seconds into the call, Kovacic states, "I can't breathe." Dispatcher Holcomb responded, "do you need an ambulance over there?" Kovacic replied, "please." A couple of seconds later, Dispatcher Holcomb then said, "O.K., I'll send somebody over to help you." Kovacic is heard saying "please" once more. The connection then ended at that point.
 {¶ 9} According to Kovacic's deposition, the following version of events occurred. On the evening in question, Kovacic called 9-1-1 because she was having difficulty breathing. She later found out that she had an acute asthma attack. She stated that she told the 9-1-1 operator "help seven times before she responded to [her]." Further, the she alleges that the operator did not ask her one question, and then hung up on her, and that she did not know if she was going to send an ambulance to help her. She "feared that they were not going to come."
 {¶ 10} She claimed that a police officer arrived at her house prior to the ambulance. When the officer saw her, she said that he ran toward her, pushed her back in her house and onto a dining room chair. He then handcuffed her arms behind her back. She could not talk, so she could not ask him why he was handcuffing her.
 {¶ 11} According to Kovacic, the paramedics arrived soon after the officer. She could not understand why they began asking her "bizarre questions," such as, "what's your name, is your name this, is your name that, when did you move here, are you shacking up with somebody, are you renting, do you own this." She began pointing to the oxygen tank, and the paramedic told her, "don't worry, we're getting to that." He put the oxygen mask on her, but she did not feel any relief. She tried to explain to him that it was not helping. He took the mask off. She said to him, "please, I'm dying." At that point, she said that, "he sat back on his haunches, laughed, and he said, she said she's dying, let's watch her die."
 {¶ 12} She maintained that while all of this was occurring, the officer had been taking the handcuffs off "intermittently[,] * * * probably three or four times[.]" They, meaning the officer and the paramedics, "all kind of enjoyed this handcuffing going on and on." She sustained multiple bruises from the handcuffs.
 {¶ 13} The final time the officer took the handcuffs off, she felt that it was her opportunity to get outside to get to the ambulance. She began to head towards her front door, when she heard someone say, "[s]he's getting away, or * * * she's leaving." Another voice responded, "[d]on't worry, she's not going anywhere[.]" She made it outside and she saw a paramedic leaning against her garage, "[j]ust taking it easy[.]" She pointed to the gurney to ask him if she could sit on it. The other paramedics reached her and began to put restraints on her "extremely tight[.]" Officer Lewis then handcuffed her, and in doing so, he climbed on top of her and put his knee on her chest in order to hold her down while he reached for her other arm. Soon after she was in the ambulance, she lost consciousness. She remembered opening her eyes at one point, and there was nothing on her face to help her breathe, nobody was attending to her or talking to her, and nothing was being done to assist her. She had a heart attack "upon arrival to the ER."
 {¶ 14} According to Officer Lewis's deposition, he recalled the following version of the events on the evening of October 12, 2002. He was on road patrol when he received a dispatch call that the fire department was en route to help a female in respiratory distress. He indicated that most of the time, the police go the scene to "spot the house for the squad[.]" In this case, he said that the fire department arrived "almost simultaneously" to his arrival.
 {¶ 15} He stated that he had not had any medical training beyond basic CPR training and "First Responder" training, to "stabiliz[e] the patient * * * until the fire department [arrives]."
 {¶ 16} When he saw Kovacic, she "was hyperventilating, was gasping, very irrational." After they went into the house, the paramedics attempted to give her treatment, but she became "very combative almost from the start." He heard her say, "I can't breathe. Help me." But, when they tried to help her, she fought them, and when they put the mask on her, she ripped it off. They attempted to put the oxygen mask on her several times. He heard her say, "`[t]his is poison' or something like that." She also said, "[t]hat's not what I need. I need to get to the hospital." The paramedics were trying to explain to her what they were going to do, but she would not listen. Within a few seconds after they had gotten there, he heard the paramedics say that she was turning cyanotic, "blue", and "that her lips were turning different colors and she was going to pass out soon if she didn't get some oxygen."
 {¶ 17} Officer Lewis maintained that the paramedics finally got her to sit down on a dining room chair, but she was very fidgety and anxious. She was never restrained when she was in the house. The paramedics helped her walk outside to the gurney. As soon as she sat down on the gurney, she started kicking and screaming. EMT Walker said that if they did not control her, that she was going to fall and hurt herself.
 {¶ 18} Officer Lewis then asked Paramedic Walker if he wanted him to restrain her, and Paramedic Walker said, "[w]e got to do something. We're losing it." Thus, at that point, he handcuffed each arm to the rail of the gurney. He did not take them off until they got to the hospital. The paramedics then, with his help, put two of the three "seat belts" on her, one on the base of her legs and one around her waist. They did not put the "seat belt" on her that normally goes around the chest. She was not restrained with soft restraints or any other type of restraint. Once she was restrained, the paramedics put the oxygen mask "up near her face[.]" He said that he did not think they "applied it to her because she was just like a claustrophobic reaction." He further indicated that he has had to use handcuffs on medical patients in the past, particularly diabetics when their sugar gets low because they get very combative.
 {¶ 19} Paramedic Walker gave the following deposition testimony. He had been employed by the city of Eastlake for twenty-four years, as an EMT for sixteen years and a firefighter/paramedic since 1996. He explained that the city of Eastlake requires emergency medical personnel to maintain a certification as an EMT, either as a basic, intermediate, or paramedic level. In addition, the city requires them to be certified firefighters. He further clarified that to the best of his knowledge, EMTs are at a basic or intermediate level, and that an advanced EMT is a paramedic. An EMT can administer CPR, bandage bleeds, split bones, or apply oxygen. "[A] paramedic can administer drugs, start an IV, intubate down the throat directly into the lungs, much more advance[d] life saving capabilities." In this case, he was the senior paramedic on the scene, making him in charge of all medical treatment and EMT Kaczur was the senior firefighter on the scene, making him in charge of non-medical decisions.
 {¶ 20} He testified that the city of Eastlake Fire Department is under the "direct medical direction of LakeWest Hospital — Lake Hospital System[.]" Dr. Cunningham is the medical director in charge of all medical protocols, including emergency medical services. He stated that he regularly reviews the protocols established by Lake Hospital, but not protocols set forth by the state of Ohio, although he believed them to be consistent with the state's.
 {¶ 21} He arrived at the scene with Paramedic Harvey and EMT Kaczur. He believed that Officer Williams arrived right after they did, although it was "pretty much simultaneously]." Immediately upon observing Kovacic, he knew that she was in obvious respiratory distress. Her eyes were bulging, she had cyanosis in her nail beds, head, and neck areas, and had rapid respirations and an audible wheeze. In addition, she could only speak one word at a time. They took a pulse oximeter reading almost immediately to determine her blood oxygen level. They found that it was seventy-two percent, normal being ninety-eight percent. In this case, they "applied the oxygen and adapted the mask to albuterol almost immediately."
 {¶ 22} After they put the oxygen mask on her, Paramedic Walker claims that Kovacic became combative and agitated. She said it was not helping her and that it was poisoning her. She began to stumble around the living room. He instructed Paramedic Harvey to stay with her and try to get as much oxygen as possible near her face in what is called a "`blow-by position[,]' * * * enriching the area in the vicinity of the face with as much oxygen as possible." He indicated that when they tried to put the mask on her face after the first attempt, that it caused her to be more agitated. He further stated that, to the best of his knowledge, "[o]nce we tried [to put the mask on] the first time, we never tried to put it on her again[.]"
 {¶ 23} Paramedic Walker believed that Kovacic benefited from the oxygen therapy, that her "condition generally improved inasmuch as she was able to exert herself and speak more words together in between gasps." He did not feel that it was as productive as it could have been, but he believed that by holding the oxygen mask with Albuterol mist in close proximity to her nose and mouth, that she benefited slightly from it. Although, he noted that her oxygen level dropped to sixty percent upon arrival at the hospital.
 {¶ 24} Kovacic then walked herself outside and would not allow the mask to stay on her face. He positioned himself on one side of her as she walked and EMT Kaczur was on her other side. He stated that normally, they bring the stretcher into the house so that they have control. She sat down on the stretcher on her own volition, and then when they began to lift the stretcher, she "attempted to kick at [EMT] Kaczur and grabbed at [Paramedic] Harvey's jacket."
 {¶ 25} Paramedic Walker indicated that he was losing control of his scene at that point. He read the following from his squad report: "`[a]gain patient became combative, attempting to get off the stretcher and swinging her arms and legs. All efforts were given to help the patient, but she was frantic and out of control. I was concerned for patient's safety and safety of squad personnel. Officer Lewis asked if cuffs would help. I felt at this time it was an appropriate way to control the patient and provide a safe way to transport the patient. Cuffs were applied to each hand and attached to the cot.'" The cuffs remained on Kovacic during the transport to the hospital. Once they got to the hospital, the doctor ordered the cuffs to be removed, and then almost immediately had to order full leathers be put on her.
 {¶ 26} He stated that in the hundreds of people he has treated with respiratory problems, that he had never had a situation like this previously. He said Kovacic had told him that she was asthmatic and that this had happened to her before, and thus, it did not make sense that she did not want the oxygen. He never believed that the situation was "psychiatric." However, he did feel that she was acting irrationally.
 {¶ 27} He explained that if he has to restrain someone, he uses Kerlix (gauze). They keep Kerlix in the squad, but he did not have it available when they needed it. However, they do not have soft restraints, such as straps with Velcro, in the squad. They do not have soft restraints on the stretchers either; they only have the three seat belts.
 {¶ 28} Paramedic Walker described the protocol for treating a patient in severe distress; i.e, paramedics are directed to sit the patient up and assist ventilations with high flow of oxygen, apply Albuterol with oxygen and contact medical direction for possible administration of epinephrine. The final protocol for patients with severe distress is to start a saline IV. He indicated that they followed all of these instructions except with respect to the epinephrine and saline IV. Since Kovacic was combative, she would not allow him to inject her in order to start an IV or the epinephrine. He further stated that Kovacic was not an appropriate candidate for epinephrine since she was "breathing, * * * conversing, * * * [and] fighting."
 {¶ 29} He agreed that proper protocol stated: "[r]estraints that require a key or use of multiple knots are unacceptable[,]" and that would include handcuffs. He also pointed out that the second sentence in the General Guidelines on restraint read from the policy that, "[t]he top priority during these transports is maintenance of personal safety and injury prevention of the prehospital care providers and of the patient[,]" and that is what he was trying to do.
 {¶ 30} Paramedic Harvey's deposition testimony proceeded as follows. He graduated from paramedic school in July 2001 and began working for the Eastlake Fire Department in September 2001. He was an EMT prior to that for Willoughby Hills.
 {¶ 31} When he arrived at the scene with Paramedic Walker and EMT Kaczur, he stated that Officer Lewis was just getting out of his car. When they approached the house, he saw Kovacic standing at the front door. Per Paramedic Walker's instructions, he attempted to put the Albuterol into the oxygen mask. Kovacic, however, said that he was trying to poison her. He tried to explain to her that it was Albuterol. He recalled that she said, "`[p]lease help me,'" but then she would not let them help her. Since she would not allow them to keep the mask on her, they used a technique called a blow-by, where he just held the mask in front of her face. When she moved, he would move the mask to keep it in front of her. She kept walking around the room. She was confused in the house, but once they got outside, she became more aggressive and combative.
 {¶ 32} He stated that Kovacic was never restrained while she was in her home, by handcuffs or any other means. He further indicated that while they were in the home with her, "[s]he had full control of where she wanted to go." She just had him "tagging along with the oxygen mask." He testified that besides the three seat belts, there are no restraints on the stretcher, or in the ambulance. They do have Kerlix in the ambulance, but it is mostly used for bandaging.
 {¶ 33} According to the affidavit of EMT Kaczur, he had been employed by the Eastlake Fire Department for thirty-four years. On October 12, 2002, they were dispatched to Kovacic's home. Upon arriving at the scene, they were met by Officer Lewis. EMT Kaczur averred that he was the senior firefighter on the scene.
 {¶ 34} He saw Kovacic push the oxygen mask away from her face, saying that it did not help. He recalled that the patient got up and walked around a few times, while the paramedics tried to convince her to take the oxygen. After a few minutes, she was able to walk out of the house on her own. However, she began waiving her arms and kicking when she got on the stretcher. She almost kicked him in the face. Handcuffs were applied and he drove to the hospital.
 {¶ 35} Pursuant to the deposition testimony of Maureen A. Fabo ("Nurse Fabo"), she has been a registered nurse in the emergency room for Lake Hospital System for nineteen and a half years. She was on duty the night Kovacic arrived.
 {¶ 36} Nurse Fabo stated that according to her records, Kovacic was brought into the hospital by the rescue squad at 23:02. She did not specifically remember Kovacic, but she handled the initial charting on her. She could tell from the chart that Dr. Dolgan was also in the room with her and Kovacic.
 {¶ 37} Nurse Fabo assessed Kovacic as having shortness of breath and difficulty breathing. She also "`had inspiratory and expiratory wheezes throughout. Her color was ashen and her skin was cool and moist. She was restless crying out for help and she had positive retractions and accessory muscle usage.'" The first thing done to Kovacic at the hospital was that they transferred her to the hospital cart, reassured her, and applied soft restraints, which are made of cotton and called "wrap-around limbholders[.]" She recorded that Kovacic was restless, which meant that they had difficulty keeping her on the bed.
 {¶ 38} The next thing she recorded was that they had to actually hold the mask to Kovacic's face to give her an aerosol treatment because she was being combative. That meant that she was fighting more diligently. They gave her Albuterol and Atrovent to help her breathe, as well as oxygen. Her oxygen level was fifty-six percent when she arrived at the hospital. Her heart rate was very fast, at 135. A normal heart rate is up to one hundred. Her respiratory rate was at forty, normal being sixteen to twenty.
 {¶ 39} Nurse Fabo explained that at 11:10 p.m., Kovacic's oxygen level was up to eighty percent. At that time is also when Kovacic became nonverbal and her eyes began to twitch. At 11:19 p.m., her oxygen level was up to ninety-two percent. At 11:25 p.m., it was up to ninety-four percent. At 11:19 p.m., she responded to pain by moaning. At 11:30 p.m., she was able to answer with one or two-word sentences.
 {¶ 40} Appellees also attached to their motion for summary judgment a copy of a written report of Judy Tagt, R.N. ("Nurse Tagt"), which Kovacic's counsel had sent to appellees, purportedly as an expert report. It is simply a letter from Nurse Tagt, who works for Medical Legal Consulting Associates in Marina Del Rey, California, to Kovacic's attorney. After reviewing the records, Nurse Taft opined that Dispatcher Holcomb violated standards of practice by not remaining on the line with Kovacic until EMTs arrived, in order to reassure Kovacic, and gather as much information as possible.
 {¶ 41} Further, Nurse Tagt believed that the EMTs violated standards of practice and failed to provide adequate emergency response to Kovacic by never bringing the gurney into Kovacic's home, immediately placing soft restraints on her, and applying Albuterol. She indicated that if the patient cannot tolerate the mask, that the "blow-by" technique can be used.
 {¶ 42} Also attached to appellees' motion for summary judgment was the deposition testimony of Gregory Engle, a proposed EMT expert for Kovacic. He is currently employed as the EMS manager for Parkview Hospital in Huntington, Indiana. He indicated that he was hired by Kovacic to review documents and determine if the Eastlake emergency medical squad provided appropriate pre-hospital care. He determined that the care given to Kovacic by Eastlake EMTs did not meet the Lake Hospital Systems' standing orders (protocol). He opined that Dispatcher Holcomb violated standards of practice by not remaining on the line with Kovacic to reassure her. He further stated that the EMTs did not follow the protocols set forth by Lake Hospital System in several ways, including the manner in which they administered the oxygen and Albuterol, by failing to contact medical control, and by using handcuffs to restrain her, although he agreed that the use of keyed restraints does not affect a patient's medical treatment (other than the bruises), it was just against protocol.
 {¶ 43} Engle concluded that the fact that the EMTs were on the scene for only nine minutes, that Kovacic was at the hospital within fifteen minutes from the time she called 9-1-1, and that this was an acceptable time frame. Thus, he believed delay was not a factor in her treatment.
 {¶ 44} When asked if the EMTs acted maliciously, he said that he did not know what that meant. Appellees' counsel explained, "that it was done willfully and wantonly with a purpose to harm[.]" Engle replied that he did not believe they acted that way. He further believed that there was no disregard for her care; they simply breached the standard of care by not following protocol.
 {¶ 45} On December 2, 2004, he corrected his deposition testimony. He stated that he did not understand the term malicious. He clarified that he does believe that the intent to handcuff the patient to the cot was malicious and that not following protocols or standards of the system created a reckless intention on the part of the fire department, specifically with respect to not contacting medical control, not continuously providing high flow oxygen, and not applying soft restraints.
 {¶ 46} Kovacic also utilized Charnjit Pabla, M.D. ("Dr. Pabla") as an expert in the case. He is currently employed by Preferred ER Physicians, who is contracted by Parkview Huntington Hospital. He has been employed since 1999, and this was his first job out of residency. He wrote the emergency medical protocols for Parkview. Protocols are guidelines for EMTs.
 {¶ 47} He explained that Kovacic was severely hypoxic when the EMTs arrived at the scene. Hypoxia causes confusion, disorientation, combativeness, and it can cause hallucinations. He stated that the EMTs violated their own protocols by not applying 100% oxygen by a non-breather mask first. Instead, their report indicated that they attempted to apply Albuterol by mask, which only delivers 70% oxygen. Dr. Pabla stated that it was proper to give Albuterol, but not until after 100% oxygen applied. He opined that it was unlikely that the delay in receiving oxygen (by not applying the correct mask) had anything to do with her heart attack. Oxygen deprivation would have more likely have caused brain damage, which did not occur, and Kovacic also only had a thirty percent blockage in her heart, which was not a significant blockage. Dr. Pabla further opined that there was nothing in the record that led him to believe that the treatment provided was in any way intended to harm Kovacic, or that the EMTs acted in bad faith, despite lapses in protocol.
 {¶ 48} Appellees also retained Lawrence Martin, M.D., as an expert. Dr. Martin is a board certified in pulmonary medicine and critical care medicine and has been practicing for nearly thirty years in Cleveland, Ohio. He reviewed documents, provided a written report, and testified about the report in his deposition. He stated that Kovacic had life-threatening hypoxemia and required restraints for proper treatment. He further felt that the EMTs acted appropriately by not intubating her in the field.
 {¶ 49} On November 21, 2005, the trial court granted appellees' motion for summary judgment. It is this judgment from which Kovacic timely appeals, raising the following four assignments of error:
 {¶ 50} "[1.] The [t]rial [c]ourt erred in it's application of the standard of review of the evidence in determining a motion for summary judgment by not construing the evidence most strongly in favor of [appellant] non[-]moving party and by weighing the evidence.
 {¶ 51} "[2.] The [t]rial [c]ourt erred in applying [a]mended R.C.2305.113 to this matter, impermissibly applying that statute retroactively.
 {¶ 52} "[3.] The [t]rial [c]ourt erred in granting immunity to all [defendants pursuant [to] R.C. 4765.49 as there was substantial evidence of willful, wanton and reckless conduct on behalf of [defendants Holcomb, Lewis, Kaczur, Walker and Harvey, and of failure to properly train and supervise by [defendants [Diliberto], Ruth and Sabo.
 {¶ 53} "[4.] The [t]rial [c]ourt erred in finding that there was no objective evidence to support the claim that [appellees'] conduct was extreme and outrageous so as to go beyond all possible bounds of decency, to be considered utterly intolerable, and erred in finding that [appellant] could not show that [appellees'] act proximately caused her mental distress."
 {¶ 54} In order for a summary judgment to be granted, the moving party must prove: "* * * (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made." Mootispaw v.Eckstein, 76 Ohio St.3d 383, 385, 1996-Ohio-389.
 {¶ 55} The Ohio Supreme Court stated in Dresher v. Burt,75 Ohio St.3d 280, 296, 1996-Ohio-107: "* * * the moving party bears the initial responsibility of informing the trial court of the basis for the motion,and identifying those portions of the record which demonstrate theabsence of a genuine issue of fact on a material element of thenonmoving party's claim." Id. at 296 (emphasis added). The `portions of the record' to which we refer are those evidentiary materials listed in Civ.R. 56(C), such as the "pleadings, depositions, answers to interrogatories," etc., that have been filed in the case.
 {¶ 56} If the moving party satisfies this burden, then the nonmoving party has the burden, pursuant to Civ.R. 56(E), to provide evidence demonstrating a genuine issue of material fact. If the nonmoving party does not satisfy this burden, then summary judgment is appropriate.Dresher, 75 Ohio St.3d at 293. Appellate courts review a trial court's granting of summary judgment de novo. Brown v. Scioto Cty. Bd. ofCommrs. (1993), 87 Ohio App.3d 704, 711. The Brown court stated that "we review the judgment independently and without deference to the trial court's determination." Id. An appellate court must evaluate the record "in a light most favorable to the nonmoving party." Link v. LeadworksCorp. (1992), 79 Ohio App.3d 735, 741. Furthermore, a motion for summary judgment "must be overruled if reasonable minds could find for the party opposing the motion." Id.
 {¶ 57} We will address Kovacic's second assignment of error first. Kovacic maintains that the trial court erred in granting summary judgment in favor of appellees city of Eastlake, as it relates to the conduct of the Eastlake Fire Department, (former) Mayor Dan DiLiberto, Eastlake Fire Department, Chief Sabo, EMT Kazur, Parmedic Walker, and Paramedic Harvey, when it concluded that the actions against them were time-barred pursuant to R.C. 2305.113. Kovacic argues that since R.C.2305.113 was enacted on April 11, 2003, six months subsequent to the date Kovacic's claim accrued, that it should not have been applied retroactively to Kovacic's claims.
 {¶ 58} R.C. 2305.113(A) sets forth the statute of limitations for medical claims: "[e]xcept as otherwise provided in this section, an action upon a medical * * * claim shall be commenced within one year after the cause of action accrued." Prior to the enactment of this statute, former R.C. 2305.11(B)(1) governed the statute of limitations for medical claims. Former R.C. 2305.11(B)(1) and R.C. 2305.113(A) are identical with respect to the one-year time limitation to file a medical claim.
 {¶ 59} What the General Assembly did when it enacted R.C. 2305.113 was expand the former definition of "medical claim" to include more categories of heath care practitioners. The former statute defining medical claims, R.C. 2305.11(D)(3), included claims "against a physician, podiatrist, hospital, home, or residential facility, against any employee or agent of a physician, podiatrist, hospital, home, or residential facility, or against a registered nurse or physical therapist," arising out of "the medical diagnosis, care, or treatment of any person." Under R.C. 2305.113(E)(3), the expanded definition of medical claims now also includes claims against licensed practical nurses, advanced practice nurses, physicians assistants, emergency medical technicians-basic, emergency medical technicians-intermediate, and emergency medical technicians-paramedic.
 {¶ 60} Kovacic maintains that the trial court did not consider the effects of R.C. 1.48 on the issue of retroactivity. R.C. 1.48 provides that, "[a] statute is presumed to be prospective in its operation unless expressly made retrospective." Appellee, on the other hand, citing toVanFossen v. Babcock Wilcox Co. (1988), 36 Ohio St.3d 100, contends that, "[appellant's] assertion that all statutes must be applied prospectively in the absence of a legislative purpose for retroactive application, ignores the long held distinction between substantive enactments and remedial enactments."
 {¶ 61} In its analysis, the trial court did not consider whether the legislature intended R.C. 2305.113 to be retroactive. It only engaged in a determination of whether the statute was remedial or substantive. It concluded that it was remedial, and that Kovacic had a reasonable amount of time of six months, plus an additional six months if she had given defendants written notice that she was considering bringing an action, and as such held that the amended statute applied.[1]
 {¶ 62} A review of Van Fossen clearly shows that the Supreme Court of Ohio held: "[t]he issue of whether a statute may constitutionally be applied retrospectively does not arise until there has been a prior determination that the General Assembly has specified that the statute so apply." Id. at paragraph two of the syllabus. The Van Fossen Court specifically addressed R.C. 1.48, and stated, "[this statute] establishes an analytical threshold which must be crossed prior to inquiry under Section 28, Article II. As we pronounced in Kiser v.Coleman (1986), 28 Ohio St.3d 259, 262 * * *, where `there is no clear indication of retroactive application, then the statute mayonly apply to cases which arise subsequent to its enactment.'" Id. at 106. (Emphasis sic.)
 {¶ 63} In fact, the Supreme Court of Ohio recently reaffirmed its holding in Van Fossen that, "[a] law may be applied retroactively if (1) there is an express legislative intent that it do so and (2) it affects a remedial, not substantive, right." State ex rel. Romans v. ElderBeerman Stores Corp., 100 Ohio St.3d 165, 2003-Ohio-5363, at ¶ 11. Thus, we agree with Kovacic's assertion that, "[i]f no such indication or intent on the part of the General Assembly is found, the analysis stops there, and the statute is deemed to be prospective only."
 {¶ 64} Accordingly, we must look to R.C. 2305.113 in order to ascertain whether the legislature intended it to apply retroactively. We conclude that it is silent on the issue. Thus, R.C. 2305.113 only applies to claims that arose after its enactment on April 11, 2003. Kovacic's causes of action arose on October 12, 2002 and as such, the amended statute does not apply. Thus, the trial court erred when it applied the amended statute and held that Kovacic's claims relating to the conduct of the Eastlake Fire Department were time barred.[2] Thus, summary judgment was improper with respect to this issue. Kovacic's second assignment of error is well-taken.
 {¶ 65} In Kovacic's first assignment of error, she argues that the trial court improperly applied the summary judgment standard with respect to "the issue of wanton and reckless conduct." In her third assignment of error, she contends that the trial court erred when it granted immunity to all defendants pursuant to R.C. 4765.49 after it determined that the actions did not rise to the level of "wanton and reckless conduct." Since these two assignments of error are interrelated, we will discuss them together.
 {¶ 66} R.C. 4765.49 provides:
 {¶ 67} "(A) A first responder, emergency medical technicians] * * * [are] not liable in damages in a civil action for injury, death, or loss to person or property resulting from the individual's administration of emergency medical services, unless the services are administered in a manner that constitutes willful or wanton misconduct. * * *
 {¶ 68} "(B) A political subdivision * * * that provides emergency medical services * * * is not liable in damages in a civil action for injury, death, or loss to person or property arising out of any actions taken by a first responder, [or] EMT[s] * * * unless the services are provided in a manner that constitutes willful or wanton misconduct.
 {¶ 69} " * * *"
 {¶ 70} "(E) An employee or agent of an emergency medical service organization who * * * dispatches first responders, EMTs-basic, EMTs-I, or paramedics in response to those requests, * * * is not liable in damages in a civil action for injury, death, or loss to person or property resulting from the individual's acts or omissions * * * unless an act or omission constitutes willful or wanton misconduct."
 {¶ 71} Therefore, to defeat appellees' motion for summary judgment, Kovacic was required to produce evidence of the type listed in Civ.R. 56(C) demonstrating actions which, if presumed to be true, would constitute willful or wanton misconduct, thereby creating an exception to the immunity granted in R.C. 4765.49(A). Accordingly, resolution of this matter turns solely upon whether the evidence presented by Kovacic establishes willful or wanton misconduct.
 {¶ 72} In Donlin v. Rural Metro Ambulance, Inc., 11th Dist. No. 2002-T-0148, 2004-Ohio-1704, this court stated:
 {¶ 73} "`Wanton misconduct' comprehends an entire absence of all care for the safety of others and an indifference to consequences. (* * *) It implies a failure to exercise any care toward those to whom a duty of care is owing when the probability that harm will result from such failure is great, and such probability is known to the actor." Id. at ¶ 17.
 {¶ 74} "`Wilful [sic] misconduct' imports a more positive mental condition prompting an act than does the term `wanton misconduct.' `Wilful [sic] misconduct' implies an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposely doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury." Id. at ¶ 18 (citations omitted).
 {¶ 75} "We must also distinguish negligent actions from willful or wanton misconduct, as negligence is afforded immunity under R.C.4765.49(A). First, with respect to wanton misconduct, it is axiomatic that `mere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor.'" Id. at ¶ 19, citing Fabrey v. McDonald Village PoliceDept., 70 Ohio St. 3d 351, 356, 1994-Ohio-368. "Such perversity must be under such conditions that the actor must be conscious that his conduct will in all probability result in injury." Id., citing Cobb v. MantuaTwp. Bd. of Trustees, 11th Dist. No. 2000-P-0127, 2001-Ohio-8722. "As for willful misconduct, we note that `the difference between negligence and willfulness is a difference in kind and not merely a difference in degree, and, accordingly, negligence cannot be of such degree as to become willfulness.'" Id., citing Roszman v. Sammett (1971),26 Ohio St.2d 94, 96.
 {¶ 76} We will first analyze the evidence with respect to Dispatcher Holcomb. The 9-1-1 recording shows that approximately four seconds into the call, Kovacic said, "help." It was almost seven seconds into the call before Dispatcher Holcomb states, "9-1-1, what's your emergency." Then it was not until approximately twenty-two seconds later, while Kovacic states "help" four or five more times during that time and then finally explains, "I can't breathe," before Dispatcher Holcomb responded to Kovacic, asking her, "do you need an ambulance over there?" Kovacic is heard saying, "please" on the recording, and then Dispatcher Holcomb says, "O.K., I'll send somebody over to help you." The connection ends at that point.
 {¶ 77} Kovacic testified in her deposition that she was afraid that the 9-1-1 operator was not going to send an ambulance. She claimed that the 9-1-1 operator did not ask her one question and then hung up on her.[3]
 {¶ 78} Kovacics' experts in the case provided testimony that Dispatcher Holcomb violated standards of practice and protocol, which would be equivalent to breaching her standard of care to Kovacic. Standards of practice dictate that a 9-1-1 operator remain on the line with a person who calls with an emergency in order to reassure the patient until the ambulance arrives, as well as to gather as much information as possible to convey to the EMTs. Dispatcher Holcomb clearly did not do this. However, Holcomb's breach of the protocol and/or standard of care for 9-1-1 dispatchers does not constitute willful or wanton misconduct, as to remove the immunity afforded by R.C.4765.49(A).
 {¶ 79} Holcomb's conduct did not evidence a complete absence of care for Kovacic's safety and/or indifference to the consequences. Holcomb immediately dispatched an ambulance to Kovacic's residence. Fire department records establish that Kovacic called 9-1-1 at 10:44 p.m. and that a response unit was notified at 10:44 p.m., less than a minute after Kovacic called. The records further establish that that the response unit was en route by 10:46 p.m., and arrived at Kovacic's residence at 10:48 p.m.
 {¶ 80} Although Holcomb's presence on the line would have been reassuring to Kovacic, it was not essential for Kovacic's treatment and did not hinder the arrival of the EMTs. Thus, no material fact remains as to whether Dispatcher Holcomb's conduct was willful or wanton, and as such, summary judgment was appropriate with regard to Kovacic's claims against him.
 {¶ 81} Next, we will analyze the evidence presented with respect to Officer Lewis, EMT Kaczur, Paramedic Walker, and Paramedic Harvey. All four testified to substantially the same version of events. Testimony and evidence established that they arrived at the scene, almost simultaneously, that Kovacic was in severe respiratory distress, and that her blood oxygen level was seventy-two percent. Paramedics applied oxygen and adapted the mask to Albuterol almost immediately. When they put the oxygen mask on Kovacic, she became combative and agitated. Because she would not take the oxygen, the paramedics used the blow-by technique. Kovacic was never restrained while she was in the house.
 {¶ 82} All four testified that Kovacic walked outside of her own volition, but with help. Kovacic then sat down on the gurney and when they attempted to put seat belts on her, Kovacic became very combative, kicking and grabbing. Officer Lewis asked Paramedic Walker if he wanted him to put handcuffs on her. Walker said yes, since he felt Kovacic's safety and the safety of the EMTs was at risk and that he was losing control of the situation.
 {¶ 83} Kovacic's version of the events is different. She testified that Officer Lewis arrived at her home first, ran in her house, pushed her down on a chair, and handcuffed her. She also testified that Lewis removed and applied the handcuffs repeatedly while inside the home, and that the EMTs and the officer "all kind of enjoyed this handcuffing going on and on." Kovacic further testified that, when the EMTs attempted to administer oxygen, it did not working. She felt as if she was going to die. When Kovacic tried to tell the EMTs, one of the EMTs "sat back on his haunches, laughed, and he said, she said she's dying, let's watch her die."
 {¶ 84} Kovacic claimed that when Officer Lewis removed the handcuffs at one point, she felt it was her chance to get to the ambulance. When Kovacic went outside, she saw an EMT leaning against the garage, "just taking it easy[.]" She sat down and they put restraints on her "really tight," and then handcuffed her to the gurney. While they were in the ambulance, nobody was helping her.
 {¶ 85} Kovacic presented various experts who asserted that the EMTs violated their own standards of practice, or protocol, in several ways, including by initially attempting to administer oxygen and Albuterol, by not contacting medical control, and by restraining her with handcuffs. The experts asserted that by violating the protocol, the EMTs breached their standard of care. However, not one of the experts testified that the actions of the EMTs were intentional or that they acted with a total disregard for Kovacic's care.[4] More significantly, the experts testified that the only harm potentially resulting from the EMTs and Officer Lewis's conduct was that Kovacic's oxygen saturation level (SpO2) continued to fall until she arrived at the hospital. According to the evidence in record, Kovacic's oxygen level was 72 percent at the time EMS arrived at her home. After her arrival at the hospital, her oxygen level had fallen to 56 percent. The precise cause for this decline cannot be determined. Kovacic's experts opined that the failure of the EMTs to supply oxygen to Kovacic through "blow-bys" could have contributed to the decline. However, they also testified that other factors, such as Kovacic's struggling against the restraints and moving around may have also contributed to this decline, since a half an hour after her arrival at the hospital, Kovacic's oxygen level had risen to 92 percent.
 {¶ 86} Construing the evidence most strongly in Kovacic's favor, the conduct of EMTs and Lewis does not rise to the level of willful and wanton misconduct. None of the testimony suggests that the EMTs and Officer Lewis did not act in Kovacic's interests. The experts do not opine that the EMTs failed to supply Kovacic with oxygen, but that they did not do so in the most efficient manner. The experts do not opine that the use of restraints was unnecessary, but rather that soft restraints rather than handcuffs should have been applied. There is simply no evidence that the EMTs or Lewis acted perversely and without regard for Kovacic's safety.
 {¶ 87} Kovacic's testimony, when construed most strongly in her favor, does establish willful and wanton conduct on the part of the EMTs and Officer Lewis. Assuming, arguendo, that Lewis handcuffed Kovacic to her dining room chair before the EMTs arrived for no apparent reason, this would constitute willful and wanton conduct, inasmuch as it contributed nothing to Kovacic's safety or care. However, Kovacic fails to establish any causal connection between Lewis' alleged behavior and a cognizable injury. Whitfield v. Dayton, 167 Ohio App.3d 172, 2006-Ohio-2917, at ¶ 44 ("since there must always be a causal connection between disputed conduct and an injury, a plaintiff would have to satisfy proximate cause requirements even if an officer's conduct is wanton or reckless"). Kovacic was not hindered by Lewis when she pushed away the oxygen mask she claims was suffocating her. Kovacic was not hindered from pointing to the oxygen tank the EMTs brought with them. Kovacic was not hindered from walking out of the house and sitting herself down on the gurney, where she testified she was again handcuffed by Lewis. Finally, Lewis' actions did not prolong the time it took for EMS to bring Kovacic to the hospital. Without any causal connection to a cognizable injury, Lewis is entitled to summary judgment regardless of whether his conduct is considered willful and wanton.
 {¶ 88} The same analysis applies to Kovacic's allegations that one of the EMTs allegedly stated "let's watch her die" while the others laughed. Assuming, arguendo, that this is true, there is no connection between this statement and a cognizable injury. The evidence is undisputed that Kovacic was en route to the hospital nine minutes after EMS arrived at her house. There is no evidence in the record that nine minutes was not a reasonable time to begin transporting Kovacic to the hospital or that delay was factor in the treatment she received. Despite the callousness of the EMT's alleged statement, there is no relationship between the statement and Kovacic's medical condition. Accordingly, summary judgment was properly granted in favor of the EMTs.
 {¶ 89} With respect to the city of Eastlake's failure to adequately train and/or supervise, the Eastlake Fire Department's failure to train and/or supervise, and the Eastlake Police Department's failure to train and/or supervise, Kovacic did not present any evidence in order to support this claim. Thus, summary judgment was appropriate regarding this issue.
 {¶ 90} For the foregoing reasons, Kovacic's first and third assignments of error lack merit.
 {¶ 91} In her fourth assignment of error, Kovacic argues that the trial court erred in granting summary judgment to appellees on her claim of intentional infliction of emotional distress.
 {¶ 92} "To establish a claim for intentional infliction of emotional distress, a plaintiff must show (1) that the actor either intended to cause emotional distress or knew or should have known that the actions taken would result in serious emotional distress to the plaintiff; (2) that the actor's conduct was so extreme and outrageous as to go `beyond all possible bounds of decency' and was such that it could be considered as `utterly intolerable in a civilized community'; (3) that the actor's actions were the proximate cause of plaintiff's psychological injury; and (4) that the mental anguish suffered by the plaintiff was serious and of a nature that `no reasonable man could be expected to endure it.'" Buckman-Peirson v. Brannon, 159 Ohio App.3d 12, 2004-Ohio-6074, at ¶ 29, citing Yeager v. Local Union 20 (1983), 6 Ohio St.3d 369, 374-375.
 {¶ 93} Nor is it sufficient "that the defendant has acted with an intent which is tortious or even criminal, * * * that he has intended to inflict emotional distress, or even that his conduct has been characterized by `malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort."Yaeger, 6 Ohio St.3d at 375. Accordingly, the fact the defendants have allegedly acted willfully and/or wantonly does not bear on the issue of whether their conduct is extreme and outrageous.
 {¶ 94} The Supreme Court, in Paugh v. Hanks (1983), 6 Ohio St.3d 72, stated, "serious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." Id. at 78 (citation omitted). The "emotional distress" must be more than trifling, mere upset, or hurt feelings. Id. Examples of this type of psychic injury "include traumatically induced neurosis, psychosis, chronic depression, or phobia." Id.[5]
 {¶ 95} Construing Kovacic's allegations in a light most favorable to her, there are several problems with the claim for intentional infliction of emotional distress. The principal defect is the impossibility of determining exactly what caused Kovacic's emotional distress. Kovacic's affidavit, as well as the affidavits of her friends, Susan Loparo and Lynn Maloney, establish that Kovacic suffered mental stress as a result of "this incident." In the words of Kovacic's affidavit, "she has had nightmares, flashbacks, difficulty sleeping and fear about this incident, and substantial anxiety and distress over it, and been very fearful of police and of ever having to call EMS for help again." Loparo and Maloney's affidavits repeat the substance of Kovacic's affidavit, including the references to "this incident." We do not deny that Kovacic has demonstrated symptoms of extreme emotional distress. However, the cause of that "stress" is the issue.
 {¶ 96} The problem with the evidence is that very little of what is referred to as "this incident" is actionable as a claim for intentional infliction of emotional distress. That the events of the evening in question could produce severe emotional distress is clear. Kovacic's condition was critical and life-threatening. As one of the EMTs testified, Kovacic was "as close to death as you could be without seeing God." In addition to a critically low oxygen level, Kovacic lost consciousness, suffered a heart attack, and spent two days in the hospital as a result of this incident. However, neither Kovacic's medical condition nor the allegedly negligent treatment she received from EMS can serve as basis for her emotional distress claims. Kovacic's claim must be based on identifiable actions of particular defendants, not a generally stressful situation.[6]
 {¶ 97} Considering the specific actions of the defendants, there is little conduct sufficiently outrageous to support a claim for emotional distress. The dispatcher's hanging up on Kovacic after informing her that an ambulance was en route does not rise to this level. Officer Lewis' handcuffing Kovacic does not rise to this level. As was discussed above, Kovacic's testimony was that Lewis kept putting the handcuffs on and taking them off, so that Kovacic was not hindered when she pushed the breathing mask away, pointed to the oxygen tank, or walked herself out to the ambulance. Thus, there is no indication that the alleged, intermittent handcuffing of Kovacic impacted her freedom of movement or ability to receive care. It was not of a nature severe enough that "no reasonable man could be expected to endure it."[7]
 {¶ 98} Given the circumstances of this case, the alleged statement made by one of the EMTs, "let's watch her die," and the alleged enjoyment the other EMTs exhibited at Kovacic's distress, while unacceptable, do not rise to the level of extreme and outrageous conduct necessary to sustain a claim for emotional distress. Such a statement from an emergency rescue worker is shocking. However, in light of the fact that Kovacic was en route to the hospital nine minutes after the arrival of EMS, there is no evidence the EMTs actually delayed or hindered Kovacic's arrival at the emergency room. See Restatement of the Law 2d, Torts, Section 46, Comment j ("[t]he intensity and the duration of the distress are factors to be considered in determining [the] severity [of the emotional distress]").
 {¶ 99} Assuming, arguendo, that the comment made by the EMT did rise to the level of extreme and outrageous conduct, Kovacic has not established that her emotional distress was the proximate result of this one statement. Kovacic testified that she was in fear for her life. Her life was in danger, but this danger had nothing to do with the alleged comment and attitude of the EMS workers. To maintain her claim for emotional distress, Kovacic had to present some evidence that her emotional condition was the proximate result of this statement and rather than the aggregate result of "this incident."
 {¶ 100} Accordingly, we conclude that Kovacic's statements, even if true, do not state a cause of action for severe emotional distress. As such, Kovacic's fourth assignment of error is without merit.
 {¶ 101} Kovacic's second assignment of error has merit, as her claims are not time-barred. However, her first, third, and fourth assignment of error are without merit. Accordingly, the judgment of the Lake County Court of Common Pleas, granting summary judgment in favor of all defendant-appellees, is affirmed.
CYNTHIA WESTCOTT RICE, J., concurs in judgment only, DONALD R. FORD, P.J., dissents with a Dissenting Opinion.
[1] In so holding, the trial court determined that Kovacic's claims against the city of Eastlake defendants, as it relates to the conduct of the Eastlake Fire Department, Mayor DiLiberto, Eastlake Fire Department, Chief Sabo, EMT Kaczur, Paramedic Walker, and Paramedic Harvey were time-barred since the amended statute included medical claims that arose from their care and treatment.
[2] Instead, the two-year statute of limitations set forth in R.C.2305.10(A) for ordinary negligence (i.e., bodily injury), would apply.
[3] Kovacic testified in her deposition that the dispatcher did not ask her any questions and that she did not know if the dispatcher was going to send an ambulance. However, the 9-1-1 audio recording clearly shows that Dispatcher Holcomb did inform Kovacic that she was going to send an ambulance. Kovacic does not challenge the authenticity of the recording, and thus, there is no material fact regarding this issue. We will analyze Dispatcher Holcomb's actions according to the 9-1-1 recording.
[4] We note that Kovacic's proposed experts averred in their affidavits, attached to Kovacic's brief in opposition to appellees' summary judgment motion, that the conduct of appellees was "a reckless and wanton disregard for the well being and health" of Kovacic. However, these averments, made after appellees filed their motion for summary judgment, are a direct contradiction to the testimony they provided in their depositions. "`[U]nder (Civ.R.) 56(C), when an affidavit is inconsistent with affiant's prior deposition testimony as to material facts and the affidavit neither suggests affiant was confused at the deposition nor offers a reason for the contradictions in her prior testimony, the affidavit does not create a genuine issue of fact which would preclude summary judgment.'" Byrd v. Smith, 110 Ohio St.3d 24,2006-Ohio-3455, at ¶ 28, quoting Lemaster v. Circleville Long Term Care,Inc. (Feb. 22, 1988), 4th Dist. No. 87 CA 2, 1988 Ohio App. LEXIS 566.
[5] In Paugh, the Supreme Court was referring to negligent infliction of serious emotional distress. 6 Ohio St.3d 72, at paragraph one of the syllabus. However, in Yeager, the Supreme Court likened the serious emotional distress in Paugh to the serious emotional distress in a claim for intentional infliction of emotional distress.6 Ohio St.3d at 374.
[6] In this respect, the affidavits of Loparo and Maloney lack any evidentiary value. While they attest to the symptoms of Kovacic's emotional distress, they have no first hand knowledge of the cause or possible cuases of these symptoms.
[7] We note also that Kovacic's fear of police officers predated the events of October 12, 2002. In her deposition Kovacic testified that, when this incident occurred, she had only lived in Eastlake one month, i.e. since September 2002. Kovacic further testified that she moved to Eastlake because she needed a "safer place" to live than Cuyahoga County, where police officers had "compromised my family's safety" by taking "revenge" on her at the behest of her ex-husband and father-in-law.