[Cite as *Widdowson v. Lake Cty.*, 2026-Ohio-67.]

# IN THE COURT OF APPEALS OF OHIO
# ELEVENTH APPELLATE DISTRICT
# LAKE COUNTY

| | |
|---|---|
| CLINTON T. WIDDOWSON, AS ADMINISTRATOR OF THE ESTATE OF TILER JOE-AUSTIN WIDDOWSON, et al., | CASE NO. 2025-L-038 |
| Plaintiffs-Appellants, | Civil Appeal from the Court of Common Pleas |
| - vs - | Trial Court No. 2023 CV 000563 |
| LAKE COUNTY, OHIO, et al., | |
| Defendants-Appellees. | |

## OPINION AND JUDGMENT ENTRY

Decided: January 12, 2026
Judgment: Affirmed in part, reversed in part, and remanded

*Larry W. Zukerman*, *S. Michael Lear*, and *Adam M. Brown*, Zukerman, Lear, Murray & Brown, Co., L.P.A., 3912 Prospect Avenue East, Cleveland, OH 44115 (For Plaintiffs-Appellants).

*Frank H. Scialdone*, *John T. McLandrich*, and *Edmond Z. Jaber*, Mazanec, Raskin & Ryder Co., L.P.A., 100 Franklin's Row, 34305 Solon Road, Cleveland, OH 44139 (For Defendants-Appellees, Lake County, Ohio, Lake County Board of Commissioners, Lake County Sheriff's Office, a.k.a., Office of the Sheriff Lake County, Frank Leonbruno, and Dan Bachnicki).

*Michael P. Quinlan* and *Kenneth E. Smith*, Mansour Gavin, L.P.A., North Point Tower, 1001 Lakeside Avenue, Suite 1400, Cleveland, OH 44114, and *Brandon D.R. Dynes*, *Todd C. Hicks*, *Bridey Matheney*, and *Christopher R. Elko*, Thrasher, Dinsmore & Dolan, 100 Seventh Avenue, Suite 150, Chardon, OH 44024 (For Defendant-Appellee, Mike Zgrebnak).

*David M. Smith* and *Amily A. Imbrogno*, Myers, Roman, Friedberg & Lewis, 28601 Chagrin Boulevard, Suite 600, Cleveland, OH 44122 (For Defendant-Appellee, Angela King).

SCOTT LYNCH, J.

{¶1}     Plaintiffs-appellants, Clinton T. Widdowson, as administrator of the Estate of Tiler Joe-Austin Widdowson and in his individual capacity, and Shannon McDougle, appeal multiple judgments of the Lake County Court of Common Pleas, granting summary judgment in favor of defendants-appellees, Lake County, Lake County Commissioners, Lake County Sheriff's Office[1], Frank Leonbruno, Dan Bachnicki, Mike Zgrebnak, Angela King, Brandy Catanese, Alexander Bowers, Samuel Edmonds, Justin Nevison, and Jeff Ridler.  Because a genuine issue of material fact exists as to whether defendants King and Catanese acted in a wanton or reckless manner, summary judgment is reversed with respect to these defendants only.  Accordingly, we affirm in part, and reverse in part, the judgments of the court below, and this matter is remanded for further proceedings consistent with this opinion.

### *Substantive and Procedural History*

{¶2}     On September 2, 2023, the plaintiffs filed a twelve-count Complaint.

{¶3}     On March 24, 2025, the trial court granted summary judgment in favor of all defendants in three separate Opinion and Judgment Entries addressing the defendants in three groups: (1) Lake County, Lake County Commissioners, Leonbruno, and Bachnicki; (2) Zgrebnak, Bowers, Edmonds, Nevison, and Ridler; and (3) King and Catanese.  The following underlying factual summary is taken from the court's Opinion and Judgment Entries (edited):

This case arose after Tiler Widdowson died on April 30, 2022, from an acute asthma attack.  Tiler Widdowson was age 24 at the

---

1. The Lake County Sheriff's Department was dismissed from the lawsuit and is not a party to this appeal. "As a department of Lake County, which is also a named defendant, the sheriff's department is not sui juris and cannot be sued as a separate entity.  Rather it is subsumed within any judgment relating to the county. [*Caganik*] *v. Kaley*, 2004-Ohio-6029, ¶ 40 (11th Dist[.]) (A sheriff's department is not a legal entity subject to suit)."  Opinion and Judgment Entry Granting Summary Judgment for Defendants Lake County, Lake County Commissioners, Frank Leonbruno, and Daniel Bachnicki, at 5.

Case No. 2025-L-038

time of his death and had a history of asthma. Clinton Widdowson is the father and Shannon McDougle is the mother of Tiler Widdowson.

Frank Leonbruno is the Sheriff of Lake County and Captain Daniel Bachnicki was head of the Central Communications Division of the Lake County Sheriff's Office that handles 911 calls for Lake County. Sergeant Mike Zgrebnak was employed by the Lake County Sheriff's Office and the shift supervisor for Deputies Alexander Bowers, Samuel Edmonds, Justin Nevison, and Jeff Ridler. Sergeant Angela King was supervisor at the Lake County 911 call center and Brandy Catanese was a dispatcher.

Evidence shows that on Saturday, April 30, 2022, at 5:26 a.m., Tiler Widdowson called 911 on his cell phone for assistance. The call was received by Sgt. King who had difficulty discerning what Widdowson was saying. She was only able to discern the word "help." She entered into the Computer Aided Dispatch (CAD) system "Male just yelling help." Despite her repeated requests, Widdowson was unable to provide his location.

Using available software, she determined that the location of the call was in the area of 1651 Mentor Avenue, Painesville, Ohio, the location of Cambridge Condominiums, a large complex with numerous condominiums. She was unable to determine the exact location in the complex. She entered into the CAD "No apt number." The rough location was determined by using cell phone towers "pinging" on the cell phone and was imprecise.

At 5:27 a.m., Sgt. King classified the call in CAD as a priority four welfare check which is a low priority, non-emergency designation. She did not dispatch fire or emergency services since she did not have a precise location but only a general location. She testified that with only a general location, she did not have enough information to dispatch fire and/or EMS personnel. Sgt. King repeatedly called back the phone number of the person calling for help and at 5:32 a.m., got a voice message for Tiler Widdowson. Tiler Widdowson did not answer the call. This information was loaded into the CAD at 5:32 a.m. After obtaining Tiler Widdowson's name, she tried searching Google, FastPeople, and other search engines available to her to locate him. The call was turned over to Catanese, also on the CAD system, who dispatches for the Lake County Sheriff's Office.

Catanese did not hear the original call. After unsuccessfully attempting to get a more precise location, Catanese dispatched deputies to Cambridge Condominiums for a welfare check at 5:35

a.m. A welfare check is automatically assigned a priority four which is relatively low priority. The first deputy, Deputy Bowers, proceeded normally to the location, not using overhead lights or a siren. He arrived in the area about 5:46 a.m. He did not believe this was an emergency call. At 5:39 a.m., Catanese, using a more precise phone locating system (RapidSOS), entered into the CAD that the phone pings closest to Unit 301 in Cambridge Condominiums. However, RapidSOS is not accurate as to the exact location. A second deputy (Deputy Nevison) arrived at the scene at 5:48 a.m.

Deputy Bowers drove through the area of the condominiums and noted that there was no activity in the area. He did not exit his car and did not knock on Unit 301's door or other doors. Deputy Nevison searched other areas of the condominium and a nearby bus stop and shopping center. Deputy Bowers testified that the quickest way to canvas an area was in his cruiser. At 5:49 a.m., Deputy Bowers entered into the CAD using his cruiser's mobile data terminal (MDT) "Checked 301 did not see anything." Since Deputy Nevison's shift was ending, he was cleared to go home. He had no further involvement in the incident.

Sgt. King, after repeatedly calling Tiler Widdowson's cell phone with no response, reviewed the recording of Tiler Widdowson's original call in an effort to discern what else Widdowson said. This was about 40 minutes after Tiler Widdowson's initial call. She determined that Widdowson had said "Please help, please help, can't breathe." She did not review the full recording of Tiler Widdowson's call which would have provided further information about his distress. At 6:06 a.m., she added the comment "just says please help, please help, can't breathe" to the CAD and further commented "sounds like it's not directly into the phone either." She did not reclassify the call from a welfare check to a medical emergency. King testified that based on the information she had, she decided not to dispatch fire and/or EMS units. This information about Widdowson's breathing problems appeared on the screen for Catanese but she did not directly radio this information to the deputies on scene. Catanese testified that she assumed the deputies were about to leave and would see this information on their mobile data terminals (MDTs) in their cruisers. However, there is no way to know if the deputies received the information in the CAD. In her deposition, Catanese agreed that she should have radioed this information to the deputies.

Sgt. King thought Catanese had transmitted the information about Tiler Widdowson's breathing problems. She saw a symbol appear on her screen indicating that Catanese had made a radio

Case No. 2025-L-038

transmission and assumed that she had radioed this information to the deputies. She had faith that Catanese was passing this information over the radio. Sending information by radio is critical since radio is the primary and fastest means of communicating to first responders. The failure to get the information by radio to Deputy Bowers about Widdowson's breathing problem was significant since the deputies could have accelerated efforts to confirm whether Tiler Widdowson was in Unit 301 and possibly made a forced entry into that unit under exigent circumstances to find Widdowson within an hour after his initial call for help.

The updated information that Widdowson could not breathe was entered into CAD about fifteen seconds before Deputy Bowers made an entry in CAD on his MDT that he was leaving the scene. He testified that he did not see the entry about Widdowson's breathing problems. Deputy Bowers testified that anything important would have been sent by radio. Deputies Bowers and Nevison had been on the scene about 26 minutes.

The off-going shift sergeant for the Sheriff's Department, Sgt. Musleh, heard the initial dispatch and decided to search for Tyler Widdowson through RMS (Records Management System). RMS provided two addresses for Tyler Widdowson that were nowhere near Cambridge Condominiums. Musleh then searched for Widdowson in CP Clear Search, a search engine that provides more accurate information than ordinary search software. This identified a Honda Accord car registered to Tiler Widdowson. Deputy Nevison had this information when he proceeded to the Cambridge Condominiums. Sgt. Musleh called the oncoming shift sergeant, Sgt. Zgrebnak, about the vehicle registered to Widdowson. Sgt. Zgrebnak told Sgt. Musleh that the upcoming day shift would follow up on this information.

Sgt. Zgrebnak relayed this information to Deputy Bowers and around 6:20 a.m. Bowers returned to Cambridge Condominiums to determine if the vehicle was there. At 6:49 a.m., Deputy Bowers noted in the CAD that the vehicle was parked in the parking spot for Unit 301. Bowers attempted to contact Widdowson by knocking on the door to Unit 301 with no results. Curtains were drawn on the first and second floor windows. Deputies Ridler and Edmonds also were dispatched to the scene. Ridler found the rear slider door to the patio unsecured but did not enter. He disclosed this to the other two deputies but did not report it on the radio. The deputies discussed whether exigent circumstances existed that would justify their forced entrance into Unit 301 and decided that exigent circumstances did not exist. They did not contact Sgt. Zgrebnak for advice. Around

Case No. 2025-L-038

6:49 a.m., the deputies left the scene. Bowers commented in the CAD "The male's vehicle was outside unit 301. Numerous attempts were made to contact him but he did not come to the door." "Did not make contact." There is no evidence the deputies were aware of the entry in CAD that Tiler Widdowson could not breathe.

At 10:55 a.m., Deputy Ridler was contacted by Deputy Bowers who suggested Ridler check the 2574 Circle Drive address. About 11 a.m., Ridler made contact with Walter Campbell, the stepfather of Widdowson at the Circle Drive address. Campbell stated that Widdowson resided at the Cambridge Condominiums but did not know the address. Campbell advised Ridler that Widdowson suffers from severe asthma and had been found unconscious from a previous episode of asthma. Neither he nor Mrs. McDougle had a key to the residence but both would go to the residence. Mrs. McDougle was at work at the time and Campbell agreed to pick her up. Ridler contacted Bowers by cell phone with this information. He did not relay this information over the radio or enter it into CAD using MDT. He drove back to Cambridge Condominiums. At 11:33 a.m., Ridler met with Bowers and Edmonds outside Unit 301. The deputies went to the rear patio and opened the unsecured slider door and called inside without a response. The deputies entered and found Widdowson's deceased body on the second floor.

## Assignments and Cross-assignments of Error

{¶4} The plaintiffs timely appealed and raise the following assignments of error:

[1.] The Trial Court erred by granting summary judgment in favor of Appellees by finding that no genuine issues of material fact exist regarding wanton or reckless conduct under R.C. 2744.03(A)(6) because reasonable minds could find that any and/or all of said Appellees acted in a reckless or wanton manner when the facts presented are viewed in a light most favorable to Appellants.

[2.] The Trial Court erred by granting summary judgment in favor of Appellees by finding that the exceptions to immunity under R.C. 2744.02(B)(4) and (B)(5) were inapplicable.

[3.] The Trial Court erred by granting summary judgment in favor of King, Catanese, Bowers, Nevison, Zgrebnak, Ridler, Edmonds, Leonbruno and Bachnicki by finding that no genuine issue of material fact exists as to Counts One, Five, Six, Seven, and Nine of Appellants' Complaint.

Case No. 2025-L-038

{¶5}    Appellees King and Catanese raise the following cross-assignments of error:

>[1.] The time of Widdowson's death and status of his asthma attack at the time of his call are unknown.  Should the lower court have found that no reasonable mind could conclude that Sgt. King or Deputy Catanese's acts or omissions were the proximate cause of Widdowson's death?
>
>[2.] RC 238.32(B) provides immunity to individuals who give instructions through a 911 system, so long as their actions are not willful or wanton.  The Dispatchers acted reasonably each time they provided instructions through their system.  The lower court should have found that the Dispatchers were immune from Appellants' claims under RC 128.32(B).
>
>[3.] Appellants bear the burden of proving that one or more of the Dispatchers' specific actions went beyond all possible bounds of decency.  The Dispatchers both acted reasonably in a difficult situation.  Should the lower court have dismissed the intentional infliction of emotional distress claim on its merits?

{¶6}    The assignments and cross-assignments of error will be considered in a consolidated fashion for clarity.

### *Standard of Review for Summary Judgment and Statutory Interpretation: De Novo*

{¶7}    Summary judgment is properly granted when "there is no genuine issue as to any material fact and … the moving party is entitled to judgment as a matter of law," i.e., when "reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor."  Civ.R. 56(C).

{¶8}    "When reviewing the decision of a trial court granting or denying a party's motion for summary judgment, an appellate court applies a de novo standard of review."  *Smathers v. Glass*, 2022-Ohio-4595, ¶ 30.  "The appellate court conducts an independent

review of the evidence without deference to the trial court's findings." *Id.* "It examines the evidence available in the record, including deposition or hearing transcripts, affidavits, stipulated exhibits, and the pleadings, *see* Civ.R. 56(C), and determines, as if it were the trial court, whether summary judgment is appropriate." *Id.* When a party seeks to resolve a case on summary judgment, the evidence cannot be weighed, only reviewed de novo. *Id.* at ¶ 32. "When factual ambiguities exist," and even when they do not, "inferences must still be resolved in favor of the nonmoving party." *Id.*

{¶9} Likewise, questions of statutory interpretation are reviewed de novo. *State v. Logan*, 2025-Ohio-1772, ¶ 8. The "main objective is to determine and give effect to the legislative intent," without "deference to the lower court's decision" or being "limited to choosing between the different interpretations of the statute presented by the parties." *Turner v. CertainTeed Corp.*, 2018-Ohio-3869, ¶ 11. The same rules of construction that govern the interpretation of statutes are generally applied to the interpretation of constitutional language. *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, 2022-Ohio-65, ¶ 84.

### *Political Subdivision Tort Liability*

{¶10} "[A] political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." R.C. 2744.02(A)(1). "A 'governmental function' includes … [t]he provision or nonprovision of police, fire, emergency medical, ambulance, and rescue services or protection." R.C. 2744.01(C)(2)(a). Accordingly, "the broad immunity of R.C. Chapter 2744" provides the defendants herein "a complete defense to a negligence cause

of action," unless one of the statutory exceptions apply. *Doe v. Greenville City Schools*, 2022-Ohio-4618, ¶ 9-10. The statutory exceptions to immunity will be considered in relation to particular defendants.

***Second Claim (Wrongful Death); Third Claim (Wrongful Death); Fourth Claim (Breach of Duty by King and Catanese); Fifth Claim (Failure to Supervise 9-1-1 Employees by Leonbruno, Bachnicki, and/or Zgrebnak); Seventh Claim (Failure to Supervise Police Officers); Twelfth Claim (Survival Action)***

{¶11} The second claim of the plaintiffs' Complaint asserts that defendants Lake County, Lake County Board of Commissioners, Leonbruno, and/or Bachnicki caused the wrongful death of Tiler Widdowson. The third claim asserts the same against defendants Zgrebnak, King, Catanese, Bowers, Nevison, Edmonds, and/or Ridler. The fourth claim asserts that defendants King and/or Catanese breached the duty of care owed to Tiler thereby causing injury. The fifth claim alleges that defendants Leonbruno, Bachnicki, and/or Zgrebnak breached the duty of care owed to Tiler by failing to train and/or supervise dispatchers King and Catanese. The seventh claim raises a similar allegation against Leonbruno and/or Zgrebnak with respect to the deputies involved in responding to Tiler's 911 call. The twelfth claim seeks damages for injuries on behalf of Tiler against all defendants.

{¶12} These claims are all grounded in tort (breach of duty) and their focus is the conduct of the employees of Lake County and the Board of Commissioners. The employee of a political subdivision "is immune from liability unless … [t]he employee's acts or omissions were … in a wanton or reckless manner." R.C. 2744.03(A)(6)(b). In the summary judgment context, the issue is "not whether the [political subdivision] employees acted in a reckless or wanton manner but whether reasonable minds could find that they acted in such a manner when the facts presented are viewed in a light most

Case No. 2025-L-038

favorable to [the plaintiffs]." *Smathers*, 2022-Ohio-4595, at ¶ 34. It is generally recognized that "issues regarding recklessness and wantonness are generally questions for the jury to decide." *Hill v. Kiernan*, 2025-Ohio-5518, ¶ 33 (8th Dist.); *O'Toole v. Denihan*, 2008-Ohio-2574, ¶ 75 ("the determination of recklessness is typically within the province of the jury," although the standard is "high"); *Fabrey v. McDonald Village Police Dept.*, 70 Ohio St.3d 351, 356 (1994) ("the issue of wanton misconduct is normally a jury question").

{¶13} The Ohio Supreme Court emphasizes that "wanton" and "reckless" "describe different and distinct degrees of care and are not interchangeable." *Anderson v. Massillon*, 2012-Ohio-5711, paragraph one of the syllabus. "Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Id.* at paragraph three of the syllabus; ¶ 33 ("one acting in a wanton manner is aware of the risk of the conduct but is not trying to avoid it and is indifferent to whether harm results") (citation omitted).

{¶14} "Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id.* at paragraph four of the syllabus; ¶ 34 ("reckless conduct is characterized by a substantial and unjustifiable risk of harm to others and a conscious disregard of or indifference to the *risk,* but the actor does not desire harm") (citation omitted). Stated otherwise, "[r]ecklessness is a perverse disregard of a known risk" and "necessarily requires something more than mere

negligence." *O'Toole* at paragraph three of the syllabus. "The actor must be conscious that his conduct will in all probability result in injury." *Id.*[2]

{¶15} "The violation of a statute, ordinance, or departmental policy enacted for the safety of the public is not per se willful, wanton, or reckless conduct, but may be relevant to determining the culpability of a course of conduct." *Anderson* at paragraph five of the syllabus. "Without evidence of an accompanying knowledge that the violations 'will in all probability result in injury,' … evidence that policies have been violated demonstrates negligence at best." (Citation omitted.) *O'Toole* at ¶ 92.

{¶16} The conduct of the Lake County and Board of Commissioners employees is necessarily considered individually.

### *Dispatcher Angela King*

{¶17} Plaintiffs cite the following instances of actions and/or omissions as evidencing wanton or reckless conduct: King initially misclassified an "obvious medical emergency 911 call as a low priority welfare check"; she waited forty minutes before replaying the recording of the 911 call; she failed to replay the entire recording and so missed Tiler state that he was dying; after learning that Tiler could not breathe, she failed to reclassify the 911 call as a medical emergency; she failed to dispatch fire or EMS units to Unit 301; she failed to broadcast by radio the information that Tiler could not breathe to the deputies; and she failed to ensure that this information was broadcast by Catanese. Appellants' Merit Brief at 14-19. *Compare Plush v. Cincinnati*, 2020-Ohio-6713, ¶ 42 (1st

---

2. We acknowledge that there may be a discrepancy between *Anderson*'s definition of recklessness as "the conscious disregard of or indifference to a known or obvious risk of harm" and *O'Toole*'s holding that "[t]he actor must be conscious that his conduct will in all probability result in injury." As explained *infra*, we find that a genuine issue of material fact exists with respect to King's and Catanese's conduct under either standard.

Case No. 2025-L-038

Dist.) (evidence that the dispatcher failed to convey "the urgency and severity of the situation" where the caller advised she was "in desperate need of help" and "going to die soon" and misclassified the call as "unknown trouble" was "sufficient to demonstrate a conscious disregard, or indifference to, a known risk of harm").

{¶18} King responds that she acted with diligence on Tiler's behalf by taking multiple affirmative steps to locate and assist him and was not idle before replaying the 911 call. Furthermore, King disputes that Tiler stating that he "can't breathe" elevated the event from a welfare check to a medical emergency. She asserts that without a definite location or event type, it would not have been appropriate to dispatch fire or EMS. Because deputies were already on the scene, King claims that it was Catanese's responsibility to ensure that deputies were informed that the caller could not breathe.

{¶19} We find that prior to hearing Tiler's complaint that he could not breathe at about 6:06 a.m., King's conduct was at most negligent. The initial classification of the call as a welfare check was in accordance with call center policies. In addition to classifying the event, King noted that the male caller was yelling "help" and Catanese duly broadcast this information when dispatching Deputy Bowers.

{¶20} After realizing the severity of the situation, however, King's conduct could be described as the failure to exercise any care in circumstances in which there was a great probability of harm and/or the conscious disregard of or indifference to an obvious risk of harm. The critical issue of whether Tiler's not being able to breathe constituted a medical emergency, i.e., a situation requiring an emergency medical response, is not one that needs to be resolved. We make no determinations regarding the facts of the matter. Whether the words "can't breathe" connoted a life-threatening emergency in this context

Case No. 2025-L-038

is for the jury to decide.  For summary judgment purposes, the plaintiffs are entitled to that reasonable inference, despite King's testimony that she "had no reason to believe at that time [*i.e.,* after learning that Tiler could not breathe] that it was just a medical emergency or if it could have been more" and that it was not appropriate to dispatch fire and EMS at that time.

{¶21}   The plaintiffs are entitled to any favorable inferences from the fact that forty minutes had elapsed before King replayed the call and that, by only replaying a portion of the call, King was unaware that Tiler also said he was dying.  As noted above, we do not find that this delay itself rises to the level of wantonness or recklessness.  The critical period for the jury's consideration begins once King realized that Tiler was saying he could not breathe.  When evaluating King's conduct from this point forward, it is proper to consider that forty minutes had already elapsed since the initial call.  Accordingly, King's conduct must be considered in light of the fact that she knew that Tiler claimed that he could not breathe and that forty minutes had elapsed.  In light of these facts, it is arguable that she should have known that there was a substantial risk of injury or death to Tiler if appropriate action was not taken.  *See O'Toole*, 2008-Ohio-2574, at ¶ 76-91 (discussing cases illustrating "the difference between recklessness and mere negligence" in which knowledge or appreciation of the risk of harm is determinative).

{¶22}   King was the fire and EMS dispatcher and could have directly dispatched those units (located about two minutes away) to the scene or, at the least, staged them (put them on notice), but did not do so.  Nor did she reclassify the call as a medical emergency.  Although deputies were already on the scene, the deputies, according to Bowers, were not "trained medically" to deal with a medical emergency.  She made a

Case No. 2025-L-038

CAD entry about Tiler not being able to breathe but did not radio deputies directly despite acknowledging that radio was the primary mode of communication and that it should never be assumed that information entered into CAD has been read by law enforcement. She verbally communicated the information to Catanese and assumed that she had broadcast it to the deputies but did not confirm that Catanese broadcast it or that the deputies responded to it, despite having a supervisory role over her. Bowers testified that, if he had been aware that Tiler could not breathe, he would have entered Unit 301. Again, it is not for this court to draw conclusions from this evidence, particularly in hindsight. We do find that the plaintiffs merit the opportunity of making that case to the jury. Accordingly, summary judgment was improperly granted with respect to King.

***Dispatcher Brandy Catanese***

{¶23} Plaintiffs contend that Catanese's conduct was wanton and/or reckless based on the following: Catanese delayed for eight minutes after King's initial classification of the call before dispatching deputies; after learning that King had updated CAD with information that Tiler could not breathe, she did not inform the responding deputies, Bowers and Nevison; and she did not reclassify the call as a medical emergency or dispatch fire and/or EMS to the scene.

{¶24} As with King, we conclude that, prior to discovery of the crucial information that Tiler could not breathe, the evidence at best demonstrates negligence rather than recklessness. At this point, both the nature and the location of the event remained uncertain.

{¶25} Catanese acknowledged that she should have radioed the updated CAD information to Deputy Bowers at 6:06 a.m. She had earlier broadcast by radio the

Case No. 2025-L-038

important information that the caller was asking for help and that the call was pinging closest to Unit 301. She assumed, however, that Bowers had read the information because he was typing on the CAD at the same time. The assumption is suspect in light of the fact that Bowers was preparing to clear the scene at 6:06 a.m. A jury could conclude that it was not reasonable to assume that Bowers had seen the CAD about Tiler being unable to breathe if he was clearing the scene – he would have had less than a minute to investigate the new information and nothing about Bowers' subsequent conduct was consistent with knowledge that the situation had become a medical emergency. Bowers' own entries into CAD unequivocally state that contact was not made with the caller when he actually cleared the scene at 6:12 a.m. As noted above, the deputies were not trained to handle a medical emergency although, with fuller knowledge of Tiler's condition, they would have entered his apartment. Therefore, we find that a genuine issue of material fact exists as to whether Catanese's conduct was wanton and/or reckless.

{¶26} We find King's and Catanese's conduct in the present case comparable to the conduct of the defendants, employees of a county children's services agency, in *Smathers* inasmuch as their conduct evidenced a conscious disregard or indifference to a known risk. In that case, the Supreme Court found that a genuine issue of material fact existed as to whether the employees acted wantonly or recklessly in failing to protect a child in her mother's custody. The child was hospitalized in the course of the agency's involvement with the family. Upon discharge, medical staff noted "that the hospital was reluctant to release [the child] because of suspected abuse and her parents' apparent inability to provide for her safety." *Smathers*, 2022-Ohio-4595, at ¶ 39. Following the release of the child and/or the agency's learning of the suspected abuse, the child was

Case No. 2025-L-038

allowed to remain in the mother's custody with minimal supervision. The Supreme Court held that summary judgment was not appropriate under the circumstances: "There is no evidence that any agency employee followed up with the PICU physicians who had recorded these concerns to better understand the basis for their conclusions regarding abuse and neglect; rather, the evidence presented could support a finding that the workers recklessly or wantonly disregarded the doctors' documented concerns." *Id.* at ¶ 42.

{¶27} King's and Catanese's response to the Tiler's being unable to breathe is of a similar character. Not being able to breathe may not "necessarily" imply a medical emergency any more than the hospital's concerns in *Smathers* necessarily implied physical abuse. The failure to respond in a manner consistent with the known risk of harm once that crucial information was discovered, however, creates a triable issue as to whether the conduct is wanton or reckless. *Smathers* makes clear that a government employee's actions, as well as the failure to act, may constitute wanton or reckless conduct when those actions are an ineffectual response to a known risk of harm. *Id.* at ¶ 43-44.

{¶28} Here, neither King nor Catanese contacted emergency medical services or broadcast that Tiler could not breathe to the deputies (who would have been unable to provide medical assistance in any event). Instead, a note that the caller "just says please help, please help, can't breathe" was entered in CAD which was not, according to the evidence, an acceptable or reasonable manner of communicating critical information. The import of the qualifying word "just" is uncertain but could be construed as minimizing the seriousness of the situation (consistent with her lack of more vigorous action). Bowers

testified that it was his expectation that dispatch would give him all the pertinent information via radio and update him if they had entered any CAD notes. King and Catanese both confirmed that radio was the "primary" means of communication and King that it should not be assumed deputies have read CAD notes. Despite this, no effort was made to confirm that the deputies were aware of the newly discovered information and, to the contrary, there was evidence that they were not aware. These circumstances demonstrate that triable issues of fact exist and that it would not be unreasonable for a jury to find the conduct was beyond mere negligence, *i.e.*, that it was wanton and/or reckless.

### *Proximate Cause*

{¶29} In their first cross-assignment of error, King and Catanese argue that, even if their conduct could be found wanton or reckless, they are nevertheless entitled to judgment because the plaintiffs cannot establish that their conduct proximately caused any harm. The plaintiffs failed "to present any competent evidence that [Tiler] was still alive at a point where different dispatcher action could have changed the outcome," and "[a]bsent such evidence, [their] case rests on conjecture that a 'timely response' 'likely' would have prevented death." King and Catanese's Merit Brief at 14.

{¶30} Contrary to King and Catanese's assertion regarding proximate cause, the plaintiffs' medical expert, Dr. Francisco J. Diaz, opined "that death occurred long after the first [911] call at 0526 hours and [Tiler] experienced suffering and [an] impending sense of doom for a period of time that likely exceeded one hour." Construing this evidence in the plaintiffs' favor, a genuine issue of material fact exists as to whether Tiler was alive at

Case No. 2025-L-038

the time the critical nature of his condition was discovered by King and conveyed to Catanese.

***Statutory Immunity under R.C. 128.32 [R.C. 128.96]***

{¶31} King and Catanese argue, under their second cross-assignment of error, that they enjoy a statutory immunity in addition to the immunity enjoyed as employees of a political subdivision.

{¶32} "[A]n individual who gives emergency instructions through a 9-1-1 system established under this chapter, and the principals for whom the person acts, including both employers and independent contractors, public and private, … are not liable in damages in a civil action for injuries, death, or loss to persons or property arising from the issuance or following of emergency instructions, except where the issuance or following of the instructions constitutes willful or wanton misconduct." R.C. 128.96(B) (identical to former R.C. 128.32(B)).

{¶33} In order for R.C. 128.96(B) to apply, it is necessary that King and Catanese were giving emergency instructions through a 911 system. R.C. 128.01(A) ("'9-1-1 system' means a system through which individuals can request emergency service using the access number 9-1-1"). King and Catanese construe this language to encompass "instructions given in dangerous situations that demand an immediate response," such as when King "input the need for a welfare check at Cambridge Condominiums … which informed Deputy Catanese that she needed to dispatch law enforcement." King and Catanese's Merit Brief at 15-16. While the dispatch of deputies might arguably constitute "emergency instructions" (we offer no opinion on this point), the dispatching of officers was not "through a 9-1-1 system" but, according to Catanese, through the sheriff's office

Case No. 2025-L-038

radio.  *Chavalia v. Cleveland*, 2017-Ohio-1048, ¶ 60 ("[a]ppellee's wrongful death claim arises out of the dispatchers' failure to timely dispatch a zone car; it does not 'aris[e] from the issuance … of emergency instructions' 'through a 911 system'").  Since neither King nor Catanese communicated with the deputies through a 911 system, they are not exempt from liability in damages pursuant to R.C. 128.96(B).

***Deputy Alexander Bowers***

{¶34}  The plaintiffs' claims against Deputy Bowers are premised on the following: the failure to employ emergency lights and/or sirens when responding to Cambridge Condominiums; the failure to exit his cruiser during the initial visit to Cambridge Condominiums; the failure to check Unit 301's parking spot for Tiler's vehicle; the failure to check CAD notes before clearing the scene at 6:12 and 6:49 a.m.; determining that exigent circumstances did not justify entering Unit 301; and not following-up on the Tiler's 911 call until directed to do so by Sergeant Zgrebnak.

{¶35}  In the absence of knowledge that Tiler could not breathe and that he was dealing with a medical emergency, Deputy Bowers is at most negligent rather than wanton or reckless.  The two most critical actions (or inactions) by Bowers were the decision that exigent circumstances did not justify entry and the failure to check the CAD notes.  With respect to the first of these, to justify entry into Unit 301 Bowers had to "reasonably believe that a person within is in need of immediate aid."  (Citation omitted.) *State v. Dunn*, 2012-Ohio-1008, ¶ 18.  In the present case, Bowers was dispatched to the Cambridge Condominiums for a low priority welfare check with no real conception of what aid or help Tiler might have needed.  The decision against entering may not have been the proper one, but it can hardly be deemed wanton or reckless.  As for checking the CAD

notes, the evidence is that both the deputies and the dispatchers understood that critical information, such as a medical emergency, should have been broadcast by radio. Certainly, Bowers should have been checking the CAD, but what is lacking is the evidence of a great probability or obvious risk of harm that could result from the failure to check notes. For these reasons Bowers was entitled to judgment as a matter of law.

### Deputy Justin Nevison

{¶36} The plaintiffs base Deputy Nevison's purported wanton and reckless conduct on: the failure to use lights and sirens when responding to Cambridge Condominiums; the failure to exit his cruiser; the failure to check for Tiler's vehicle; and the failure to check the CAD notes. As with Deputy Bowers, we find these deficiencies evidence of, at most, negligence. The use of lights and sirens, exiting the vehicle, and checking the Unit 301 parking spot would have had only a minimal effect on the course of events. The failure to check CAD, while serious, is not wanton or reckless without an appreciation of the probability or risk of harm. Nevison was entitled to judgment as a matter of law.

### Deputy Jeffrey Ridler

{¶37} The plaintiffs cite the following in support of their claim that Deputy Ridler acted wantonly and/or recklessly: failure to use lights and sirens; failure to check CAD notes; failure to inquire about the nature of the call; failure to communicate with dispatch and/or Sergeant Zgrebnak; failure to enter Unit 301 based on exigent circumstances; failure to follow-up on Tiler's 911 call until directed to do so; and the failure to broadcast the information that Tiler suffered from asthma.

Case No. 2025-L-038

{¶38}   Again, the failures identified by the plaintiffs demonstrate negligence rather than wanton or reckless conduct.  The plaintiffs do not demonstrate that Deputy Ridler had any greater knowledge (or any reason to have greater knowledge) of the likelihood of harm than the other deputies.  Ridler was entitled to judgment as a matter of law.

***Deputy Stuart Edmonds***

{¶39}   The plaintiffs' claims against Deputy Edmonds are based on: the failure to use lights and sirens; the failure to check CAD notes; the failure to obtain further information about the situation; the decision not to enter Unit 301; and the failure to follow-up on Tiler's call.

{¶40}   The only circumstance distinguishing Deputy Edmonds' conduct from that of the other deputies is that he believed exigent circumstances existed to enter Unit 301 but remained silent about this belief, deferring to the judgment of the more experienced Deputies Bowers and Ridler.  The failure to voice his differing estimation of the situation, however, does not elevate his conduct to wanton or reckless.  Edmonds was entitled to judgment as a matter of law.

***Sergeant Michael Zgrebnak***

{¶41}   Sergeant Zgrebnak's conduct is alleged to have been wanton and/or reckless for the following reasons: he failed to exercise diligence in resolving Tiler's 911 call prioritizing other tasks, such as "paperwork," over the necessary supervision of his deputies; and failing to review the CAD notes.

{¶42}   Sergeant Zgrebnak's alleged deficiencies in resolving Tiler's 911 call are mitigated by the same circumstance that affected the deputies' decision not to enter Unit 301: he understood the call as a low priority, non-emergency welfare check.  Given his

understanding of the nature of the call, his conduct in resolving it does not go beyond negligence.  Zgrebnak was entitled to judgment as a matter of law.

**Sheriff Frank Leonbruno and Captain Daniel Bachnicki**

{¶43}  The plaintiffs raise the following claims against both Sheriff Leonbruno and Captain Bachnicki with regard to training and supervision: they failed to ensure that deputies understood the accuracy of the RapidSOS locating system; they failed to implement a policy requiring deputies to check CAD notes before leaving the scene of an unresolved 911 call; they failed to train deputies regarding exigent circumstances; and they failed to implement a policy to treat welfare checks as potential emergency situations.  Neither Leonbruno nor Bachnicki was directly involved with the events of April 30, 2022.  Rather, the plaintiffs maintain that the alleged deficiencies "created systemic risks of harm to the public."  Appellants' Merit Brief at 29.

{¶44}  The plaintiffs rely on *Morrison v. Warrensville Hts.*, 2022-Ohio-1489 (8th Dist.), in which the court of appeals found that a police chief and a fire chief could be found liable for injuries to a 911-caller where the system lacked adequate address verification procedures ("it was generally known that emergency services had gone to the incorrect address multiple times and that issue had been raised with the Chiefs"), and the dispatch department "was understaffed, overworked, and overwhelmed" with dispatchers being "often called away from the radio to perform other duties."  *Id.* at ¶ 73.  The court concluded that "[r]easonable minds could disagree on whether the Chiefs' knowledge of the problems in the dispatch department, knowledge of mistaken address, and the failure to take simple steps to address these issues amounted to a conscious disregard of or indifference to a known or obvious risk of harm."  *Id.* at ¶ 75.

Case No. 2025-L-038

{¶45} None of the extenuating circumstances in *Morrison* exist in the present case. The plaintiffs present no evidence of ongoing, systemic failure to provide emergency services in Lake County. From the time of the initial dispatch, Unit 301 was identified as the possible source of the call and the connection to Tiler was soon established through the location of his Honda Accord. The primary failures leading to this tragedy are rooted in the dispatchers' handling of the call after it became known it was a medical emergency. The dispatchers' failures do not arise from a lack of proper training or supervision. Dispatchers and deputies recognized the seriousness of being unable to breathe and that the radio was the primary means of communicating critical information. There is simply no evidence of systemic failures, as opposed to lapses in personal judgment, to sustain claims based on deficient training or supervision. Leonbruno and Bachnicki were entitled to judgment as a matter of law.

{¶46} The plaintiffs' second, third, fourth, and twelfth claims have potential merit with respect to defendants King and Catanese but otherwise fail as a matter of law. Summary judgment was properly granted as to the plaintiffs' fifth and seventh claims.

### Eighth Claim (Breach of Duty by Defendants Lake County, Ohio; Lake County Board of Commissioners; and/or Lake County Sheriff's Office)

{¶47} The eighth claim of the Complaint alleges that Lake County, the Board of Commissioners, and their employees may be held liable to the plaintiffs for damages under the physical defect exception to political subdivision immunity.

{¶48} "[P]olitical subdivisions are liable for injury, death, or loss to person or property that is caused by the negligence of their employees and that occurs within or on the grounds of, and is due to physical defects within or on the grounds of, buildings that are used in connection with the performance of a governmental function." R.C.

Case No. 2025-L-038

2744.02(B)(4). The plaintiffs claim that the foregoing exception applies to the facts of the present case. "Tiler's call connected him to the 911 system via cell towers to CC [the Sheriff's Central Communications unit], a governmental function," thereby placing him on the "virtual grounds" of a government building. The plaintiffs further assert that the failure to train deputies, the reckless and/or wanton response to the 911-call, and the failure of deputies to investigate constitute a "physical defect." Appellants' Merit Brief at 31.

{¶49} For support, the plaintiffs rely on a series of cases for the following proposition:

> In determining whether a building is used in connection with a governmental function, the building need not "house the actual, physical operations, maintenance, etc., of a governmental body," but instead the question is "whether the building is logically, not literally, connected to the performance of a governmental function." *Mathews* [*v. Waverly*], 4th Dist. Pike No. 08CA787, 2010-Ohio-347, at ¶ 32, citing *Moore v. Lorain Metro. Hous. Auth.*, 121 Ohio St.3d 455, 2009-Ohio-1250, 905 N.E.2d 606 (holding that a public-housing unit is a building "used in connection with the performance of a governmental function" for purposes of R.C. 2744.02(B)(4)).

*R.K. v. Little Miami Golf Ctr.*, 2013-Ohio-4939, ¶ 24 (1st Dist.).

{¶50} In the *Mathews* case, a tree limb fell on the plaintiff while she was standing in the parking lot of a park owned and operated by the City of Waverly. *Mathews* at ¶ 3. The court of appeals concluded that the shelter house and roofed pagodas located in the park bore "a logical connection to the performance of the operation or maintenance of the park" inasmuch as they were "part and parcel of the park" and "available for public use." *Id.* at ¶ 36. In *R.K.*, the plaintiff was injured by a falling tree limb while playing golf at a Golf Center owned and operated by the park district. *R.K.* at ¶ 2. The court of appeals noted that "the Golf Center qualifies as a building used in connection with the performance of the governmental function of the operation of a golf course," and "the eighth green of

the golf course [where plaintiff was injured] is part of the land around the Golf Center and is obviously devoted to the same purpose as the Golf Center." *Id.* at ¶ 28.

{¶51} In contrast to *Mathews* and *R.K.*, we find that the Cambridge Condominiums bears no logical relationship to the performance of a governmental function, i.e., the provision of police and/or emergency medical services. Rather, the relationship here is merely incidental in that the 911 call originated from the condominiums. *Plush*, 2020-Ohio-6713, at ¶ 31 (1st Dist.) ("[t]he performance of a governmental function at a privately owned facility does not transform that building into one that is 'used in connection with the performance of a governmental function'") (citation omitted); *compare Stanfield v. Reading Bd. of Edn.*, 2018-Ohio-405, ¶ 12 (1st Dist.) (school board could be held liable for injury occurring at a municipal stadium facility "where all football and track events were held for the high school").

{¶52} Moreover, regardless of any logical connection between the condominiums and the provision of police and/or emergency medical services, the appellees' conduct does not constitute a physical defect within or on the grounds. "[C]ases addressing the 'physical defect' exception involve physical defects as part of the structure of buildings and the maintenance of those structures." *Conley v. Wapakoneta City School Dist. Bd. of Edn.*, 2022-Ohio-2915, ¶ 44 (3d Dist.); *Nicholas v. Lake Cty.*, 2013-Ohio-4294, ¶ 23 (11th Dist.) ("[a]lthough the term 'physical defect' is not defined in the statute, prevailing authority holds that a 'physical defect' is a 'perceivable imperfection that diminishes the worth or utility of the object at issue'") (citation omitted); *O'Brien v. Great Parks of Hamilton Cty.*, 2020-Ohio-6949, ¶ 25 (1st Dist.) (negligent use of a riding lawnmower does not constitute a physical defect "absent some evidence that the lawnmower was broken

or improperly assembled such that the worth or utility of the lawnmower was diminished at the time of the incident").

{¶53} Accordingly, the physical defect exception to immunity in R.C. 2744.02(B)(4) does not apply in the present case.

{¶54} The eighth claim fails as a matter of law.

### Sixth Claim (Breach of Duty to Protect by Police Officers)

{¶55} The plaintiffs' sixth claim for relief was premised on the violation of the statutory duty to protect Tiler by Sergeant Zgrebnak and Deputies Bowers, Nevison, Edmonds, and/or Ridler. An exception to the doctrine of immunity is provided for as follows: "a political subdivision is liable for injury, death, or loss to person or property when civil liability is expressly imposed upon the political subdivision by a section of the Revised Code." R.C. 2744.02(B)(5). However, "[c]ivil liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon a political subdivision." *Id.*

{¶56} The plaintiffs rely upon R.C. 737.11, which provides in relevant part that "[t]he police force of a municipal corporation shall preserve the peace, [and] protect persons and property."

{¶57} Initially, it is doubtful whether R.C. 737.11 qualifies as an exception to immunity pursuant to R.C. 2744.02(B)(5) inasmuch as it has been described as imposing a "public duty" upon safety forces. *Commerce & Industry Ins. Co. v. Toledo*, 45 Ohio St.3d 96, 100 (1989); *Lockett v. Akron*, 714 F.Supp.2d 823, 838 (N.D.Ohio 2010) ("[s]ection 737.11 is simply an expression of the general duties of a municipal police department; it does not 'expressly impose' liability for failure to carry out those duties").

Case No. 2025-L-038

{¶58} More fundamentally, R.C. 737.11 expressly applies to the safety forces of municipal corporations rather than counties or a board of county commissioners. It is evident both in Ohio constitutional law as well as the Revised Code that municipal corporations and counties are distinct types of governmental entities. Ohio Const., art. X (county and township organizations) and XVIII (municipal corporations); R.C. Title III (counties) and VII (municipal corporations); also *Hamilton Cty. Bd. of Commrs. v. Mighels*, 7 Ohio St. 109, 118-124 (1857) (discussing at length the differences between counties and municipal corporations at common law). Accordingly, the plaintiffs' reliance on R.C. 737.11 is misplaced.

{¶59} The sixth claim for relief fails as a matter of law and summary judgment was properly granted with respect thereto.

### Ninth Claim (Liability under former R.C. 128.32 [128.96])

{¶60} The plaintiffs' ninth claim is premised on another purported statutory exception to political subdivision immunity. *See* R.C. 2744.02(B)(5); R.C. 2744.03(A)(6)(c) (removing immunity from political subdivision employees when "[c]ivil liability is expressly imposed upon the employee by a section of the Revised Code").

{¶61} "The state, the state highway patrol, a subdivision, or a regional council of governments participating in a 9-1-1 system established under this chapter and any officer, agent, employee, or independent contractor of the state, the state highway patrol, or such a participating subdivision or regional council of governments is not liable in damages in a civil action for injuries, death, or loss to persons or property arising from any act or omission, except willful or wanton misconduct, in connection with developing, adopting, or approving any final plan [or any agreement made under section 128.09 of

the Revised Code[3]] or otherwise bringing into operation the 9-1-1 system pursuant to this chapter." Former R.C. 128.32(A)(1).

{¶62} The plaintiffs argue that the willful and wanton misconduct of the dispatchers and sheriff's deputies subject Lake County and the Lake County Board of Commissioners to liability under this statute. As with R.C. 737.11, it is questionable whether former R.C. 128.32(A) expressly imposes civil liability on a political subdivision since, as written, it expressly describes circumstances in which a political subdivision "is not liable" except in the case of willful or wanton misconduct relating to "bringing into operation the 9-1-1 system."

{¶63} In *Plush*, 2020-Ohio-6713 (1st Dist.), the court of appeals considered this language and concluded that it did not encompass willful or wanton misconduct relating to the ongoing operation of such a system. Giving the words of the statute their "plain and ordinary meaning," it concluded "that the General Assembly intended to limit a political subdivision's liability to willful and wanton misconduct relating to the creation [as opposed to operation] of a 911 system." *Id.* at ¶ 21. The court further supported its conclusions by looking at other subsections of the statute dealing "with the liability of other entities" which specified "operating a 9-1-1 system" or the "operation of a 9-1-1 system" or "participating in" or "maintaining" a 9-1-1 system. *Id.* at ¶ 22. By choosing the language "bringing into operation," the General Assembly "thus demonstrate[d] its intent to narrowly limit the liability of a political subdivision." *Id.*

{¶64} The plaintiffs counter that *Plush* is not binding authority and misinterprets the statutory language. They "assert that the phrase 'bringing into operation' under R.C.

---

3. These words were omitted from R.C. 129.32 when, in October 2023, it was repealed and re-enacted as R.C. 129.96.

Case No. 2025-L-038

128.96 should include the ongoing operation of a political subdivision's existing 911 system, as that system is arguably 'brought' into operation every time the system is used." Appellants' Reply Brief to Lake County, Lake County Commissioners, Leonbruno, and Bachnicki at 9. Although not binding, we find the reasoning of the *Plush* decision more persuasive than the plaintiffs' interpretation with respect to the import of the phrase "bringing into operation." Summary judgment was properly granted on this claim.

{¶65} The ninth claim for relief fails as a matter of law.

***First Claim – Failure to Protect in Violation of Ohio Constitution, Article I, Sections 1 and 16***

{¶66} The first claim of the Complaint alleges that the "Defendants have deprived Plaintiffs of rights secured to them by the Ohio Constitution, including the right to due process under Section 16[4] and the right to obtaining safety under Section 1[5]." On appeal, the plaintiffs argue that, when read in conjunction, Sections 1 and 16 impose a duty on "a political subdivision to render aid when an Ohioan is in danger and contacts the political subdivision through the 911 system, designed and implemented by the political subdivision, in an attempt to provide safety." Appellants' Merit Brief at 33.

{¶67} Whatever duties and obligations Sections 1 and 16 may impose on political subdivisions (or, conversely, whatever rights they may acknowledge "all men" to possess), these Sections are not self-executing and do not create an independent claim or cause of action. With respect to Section 1, the Ohio Supreme Court has held that it "is

---

4. "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay. Suits may be brought against the state, in such courts and in such manner, as may be provided by law." Ohio Const., art. I, § 16.
5. "All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety." Ohio Const., art. I, § 1.

Case No. 2025-L-038

not an independent source of self-executing protections," but, rather, "it is a statement of fundamental ideals upon which a limited government is created [that] requires other provisions of the Ohio Constitution or legislative definition to give it practical effect." *State v. Williams*, 2000-Ohio-428, ¶ 42. Likewise, Section 16 is not "self-executing" and "'legislative authority by statute is required as a prerequisite' to allowing suits against the state." (Citation omitted.) *Smith v. Ohio State Univ.*, 2024-Ohio-764, ¶ 13; *Fabrey*, 70 Ohio St.3d at 354 ("the clause permitting suits to be brought against the state is not self-executing, and … the state of Ohio is not subject to suits in tort without the consent of the General Assembly"). Nor is it accurate, as the plaintiffs claim, that there are no adequate remedies for the violation of these Sections. "The General Assembly in enacting R.C. Chapter 2744 has used that power [to define the contours of the state's liability] to create a scheme for immunity and liability of political subdivisions." *Fabrey* at 355.

{¶68} The defendants were properly granted summary judgment with respect to the first claim of the plaintiffs' Complaint.

***Tenth Claim (Intentional Infliction of Emotional Distress)***

{¶69} In their tenth claim, the plaintiffs maintain that the conduct of defendants Zgrebnak, King, Catanese, Bowers, Nevison, Edmonds, and/or Ridler constitutes intentional infliction of emotional distress. Defendants King and Catanese argue in their third cross-assignment of error that the intentional infliction of emotional distress claim fails as a matter of law.

{¶70} "To establish a claim for intentional infliction of emotional distress, a plaintiff must show (1) that the actor either intended to cause emotional distress or knew or should have known that the actions taken would result in serious emotional distress to the

Case No. 2025-L-038

plaintiff; (2) that the actor's conduct was so extreme and outrageous as to go 'beyond all possible bounds of decency' and was such that it could be considered as 'utterly intolerable in a civilized community'; (3) that the actor's actions were the proximate cause of plaintiff's psychological injury; and (4) that the mental anguish suffered by the plaintiff was serious and of a nature that 'no reasonable man could be expected to endure it.'" (Citations omitted.) *Kovacic v. Eastlake*, 2006-Ohio-7016, ¶ 92 (11th Dist.).

{¶71} In support of their claim for intentional infliction of emotional distress, the plaintiffs cite "King's 'cruel' misclassification and 40-minute delay in reviewing Tiler's call, Catanese's 'unconscionable' dispatch delay, and deputies' dismissal of an unsecured door and drug paraphernalia as intoxication" as outrageous conduct. Appellants' Merit Brief at 35.

{¶72} We find no genuine issue of material fact as to whether the defendants intended to cause emotional distress, or knew or should have known that their actions would cause any of the plaintiffs emotional distress. Nor is there evidence that the defendants' conduct exceeded "all possible bounds of decency." The defendants did nothing that would not have been found reasonable in other circumstances. While the conduct of King and Catanese may ultimately be found to have been wanton or reckless, their misjudgments and inaction simply do not constitute the sort of extreme and outrageous conduct actionable under a claim for intentional infliction of emotional distress. *Compare Kovacic* at ¶ 98 ("the alleged statement made by one of the EMTs, 'let's watch her die,' and the alleged enjoyment the other EMTs exhibited at Kovacic's distress, while unacceptable, do not rise to the level of extreme and outrageous conduct necessary to sustain a claim for emotional distress").

Case No. 2025-L-038

{¶73} The tenth claim for relief fails as a matter of law, and the third cross-assignment of error has merit.

***Eleventh Claim (Loss of Consortium)***

{¶74} The plaintiffs' eleventh claim is for loss of consortium (on behalf of Tiler's parents). The extent to which this claim has any merit is dependent upon the plaintiffs prevailing on the underlying claims against King and Catanese.

{¶75} The assignments of error and cross-assignments of error have merit to the extent indicated above.

{¶76} The judgments of the Lake County Court of Common Pleas are affirmed in part, reversed in part, and this matter is remanded for further proceedings consistent with this opinion. Costs to be taxed against the parties equally.

JOHN J. EKLUND, J., concurs,

EUGENE A. LUCCI, J., concurs in part and dissents in part with a Dissenting Opinion.

_____

EUGENE A. LUCCI, J., concurs in part and dissents in part with a Dissenting Opinion.

{¶77} I respectfully dissent from the majority opinion's decision to reverse the trial court's grant of summary judgment with respect to defendants, Angela King and Brandy Catanese. While I concur with the majority's affirmance as to all other defendants, I would affirm the trial court's judgment in its entirety. The tragedy of Tiler Widdowson's death should not lead this court to expand liability beyond what the General Assembly intended

Case No. 2025-L-038

when it enacted comprehensive immunity protections for political subdivisions and their employees engaged in emergency services.

{¶78} The majority's reversal rests on a fundamental misapplication of the legal standards governing wanton and reckless conduct. Although the majority correctly recites the standard—that recklessness requires "conscious disregard of or indifference to a known or obvious risk of harm," *Anderson v. Massillon*, 2012-Ohio-5711, ¶ 34—it applies a negligence standard while calling it recklessness. The question before us is not what King and Catanese *should have* done with the benefit of hindsight. It is whether they consciously disregarded a known probability that death would result from their actions. The majority's analysis repeatedly conflates these distinct inquiries, and that conflation produces an erroneous result.

## I. Sergeant King's Conduct

{¶79} Consider what Sergeant King actually knew when she received Tiler's call at 5:26 a.m. A male voice said only "help" in response to her repeated attempts to obtain information. The caller could not or would not provide his location, his name, or the nature of his emergency. Cell phone triangulation placed him somewhere in the general vicinity of a large condominium complex with numerous units. Under these circumstances, King's classification of the call as a welfare check was not only reasonable but consistent with department protocol. The majority opinion faults her for not immediately recognizing this as a medical emergency, but nothing in those initial moments suggested a life-threatening situation as opposed to intoxication, mental health crisis, domestic dispute, or any number of other scenarios that generate similar calls daily.

Case No. 2025-L-038

{¶80} The majority opinion makes much of the forty-minute gap before King replayed the call recording. But this criticism ignores what King was actually doing during that time. She was not idle or indifferent. She repeatedly attempted to call Tiler back, leaving voicemails when he did not answer. She searched multiple databases trying to locate him. She coordinated with Catanese to dispatch deputies to search the area. These are the actions of a professional attempting to help someone in distress, not someone consciously disregarding a known risk of harm.

{¶81} The majority's critical period begins at approximately 6:06 a.m., when King replayed the recording and heard "can't breathe." The majority characterizes her subsequent actions as demonstrating conscious disregard or indifference to an obvious risk of harm. This characterization fails for several reasons.

{¶82} *First*, the phrase "can't breathe" without additional context does not automatically indicate a life-threatening medical emergency. It could signal anxiety, panic attack, claustrophobia, positional discomfort, or numerous other non-life-threatening conditions. King specifically noted that it "sounds like it's not directly into the phone" either suggesting the caller might be impaired or not holding the phone normally. The majority suggests that King's use of the word "just" in her CAD note—"just says please help, please help, can't breathe"—evidences minimization of the emergency. This reading is uncharitable and speculative. The word "just" in context more naturally reflects that King was reporting the *limited* information available: this is all he said. Transforming a common adverb into evidence of conscious disregard illustrates the majority's results-oriented analysis.

Case No. 2025-L-038

{¶83} *Second*, the timeline after 6:06 a.m. is measured in seconds, not minutes. The CAD entry noting that Tiler could not breathe and Deputy Bowers's entry indicating he was leaving the scene were separated by approximately fifteen seconds. This compressed timeframe does not support a finding of conscious disregard—it reflects the reality that multiple actors were operating simultaneously with incomplete information.

{¶84} *Third*, deputies were already on scene when this information became available. The logical and reasonable response was to update those deputies who could immediately investigate and potentially render aid or call for medical assistance if needed. King verbally communicated this information to Catanese, whom she reasonably believed would relay it to the deputies. The failure of this communication chain may constitute negligence, but it does not rise to the level of conscious disregard required for recklessness.

{¶85} *Fourth*, King still lacked a precise location for Tiler. The majority suggests that King should have dispatched or at least staged fire and EMS units, noting they were "about two minutes away." But staged for what? To search a large condominium complex without a specific unit number? Dispatching or staging units to an imprecise location would have been an exercise in futility and potentially diverted critical resources from other emergencies where locations were known. The majority's criticism assumes knowledge King did not possess.

{¶86} The majority also emphasizes that King had "a supervisory role" over Catanese and failed to confirm that the information was broadcast. But the evidence shows King saw a symbol on her screen indicating Catanese had made a radio transmission and reasonably assumed the information had been relayed. Having faith in

Case No. 2025-L-038

a colleague's performance of routine duties is not conscious disregard of a known risk—it is ordinary workplace reliance.

## II. Dispatcher Catanese's Conduct

{¶87}  The majority's analysis of Catanese's conduct suffers from similar flaws. Catanese received a low-priority welfare check call with limited information. She dispatched deputies within eight minutes, a reasonable response time for a non-emergency call. When King updated the CAD with the breathing difficulty information, Catanese saw that Deputy Bowers was actively typing in the system at that very moment. Her assumption that he had seen the update, while perhaps incorrect, was not unreasonable given the contemporaneous activity she observed. Catanese acknowledged in her deposition that she should have radioed the information—but the question is not what she *should have* done. The question is whether her failure to do so reflected conscious disregard of a known probability of death.

{¶88}  The majority notes that Bowers testified he would have entered Unit 301 if he had known Tiler couldn't breathe. This testimony establishes a causal connection for negligence purposes but does not transform Catanese's failure to radio into recklessness. Catanese did not know that Bowers had not seen the CAD entry. She observed him actively using the system. Her assumption was wrong, but she was not indifferent.

## III. The Majority's Reliance on *Smathers* Is Misplaced

{¶89}  The majority's reliance on *Smathers v. Glass*, 2022-Ohio-4595, proves too much. In *Smathers*, child protective services workers had explicit medical documentation stating that a hospital was reluctant to release a child due to suspected abuse and the parents' apparent inability to provide for her safety. The workers then allowed the child to

Case No. 2025-L-038

remain with the mother with minimal supervision despite these clear, documented warnings from medical professionals. *Id.* at ¶ 39.

{¶90} The situations are not analogous. The *Smathers* workers ignored professional medical judgment about identified risks to an identified child at a known location. King and Catanese had an ambiguous phrase from an unknown caller at an uncertain location who could not clearly communicate his needs. They had no medical documentation, no identified victim at a known location, and no clear warning of a life-threatening situation.

{¶91} The majority argues that both cases involve an "ineffectual response to newly discovered critical information." But this framing assumes the conclusion. The *Smathers* workers received unambiguous professional warnings; King and Catanese received ambiguous words from an unidentified caller. The *Smathers* workers took minimal action despite clear warnings; King and Catanese took multiple affirmative steps—database searches, callback attempts, deputy dispatch, CAD updates—in response to unclear information. To equate these situations is to hold that any incorrect judgment by emergency personnel, viewed in hindsight, may constitute recklessness.

## IV. Proximate Cause

{¶92} The proximate cause analysis further demonstrates why summary judgment should be affirmed. Dr. Diaz's opinion that death occurred "long after" the initial call and that Tiler "likely exceeded one hour" of suffering creates only speculation, not evidence, that he was saveable at 6:06 a.m. The plaintiffs bear the burden of proving proximate cause. An opinion that death occurred "long after" the call does not establish that Tiler was medically salvageable when King discovered he could not breathe, that

Case No. 2025-L-038

EMS could have located him in the complex without a unit number, or that entry and treatment could have been accomplished in time. There is no evidence establishing when Tiler passed the point where medical intervention could have saved him. There is no evidence that EMS, even if immediately dispatched at 6:06 a.m., could have located Tiler in the complex, gained entry to Unit 301, and successfully reversed what was apparently a severe and prolonged asthma attack. The causal chain between the dispatchers' actions and Tiler's death is simply too attenuated and speculative to support liability.

## V. Statutory Immunity Under R.C. 128.96(B)

{¶93}   The majority opinion also fails to adequately consider the statutory immunity provided by R.C. 128.96(B). When dispatchers receive emergency calls and coordinate response through the 911 system they have implemented, they are giving emergency instructions through that system. The fact that the final communication to field units occurs via radio rather than telephone is a distinction without a difference in the modern, integrated emergency-response infrastructure. The majority's narrow reading of "through a 9-1-1 system" defeats the legislative purpose of protecting those who operate emergency communication systems.

## VI. Policy Implications

{¶94} Perhaps most troublingly, the majority's decision will have profound negative consequences for emergency services throughout Ohio. Every shift, dispatchers across this state face dozens of ambiguous calls. The majority's holding effectively requires that any caller who says "can't breathe"—which could indicate asthma, anxiety, panic, positional discomfort, or simple exertion—triggers an immediate medical emergency response regardless of whether the caller can be located.

Case No. 2025-L-038

{¶95} If dispatchers face potential personal liability whenever they must make judgment calls with incomplete information, the results are predictable and harmful. Dispatchers will either over-commit resources to every ambiguous call, thereby depleting availability for confirmed emergencies, or they will hesitate in making necessary quick decisions, potentially causing delays in other emergencies. Many qualified professionals will simply leave the field rather than face personal liability for split-second decisions made under intense pressure with limited information.

{¶96} The General Assembly recognized these realities when it provided broad immunity protections in R.C. Chapter 2744. Courts are not empowered to erode these protections even where a tragedy has occurred. The remedy for improving emergency response systems lies with the legislature and local governments through better funding, enhanced technology, and improved training protocols. It does not lie in judicial expansion of liability that undermines the immunity protections the General Assembly specifically enacted to ensure that emergency responders can perform their critical duties without fear of personal liability for every decision that does not result in a perfect outcome.

## VII. Conclusion

{¶97} The proper standard is not whether different decisions might have led to a better outcome—which is the negligence standard—but whether the defendants acted with conscious disregard of a known probability of death or serious injury. Viewing the evidence in the light most favorable to the plaintiffs, as we must on summary judgment, still does not create a genuine issue of material fact on this question. At most, the plaintiffs have shown that King and Catanese made professional judgments that, with the benefit

Case No. 2025-L-038

of hindsight, appear to have been incorrect. This is the definition of negligence, not recklessness.

{¶98} The majority opinion reflects an understandable emotional response to a tragic outcome, but hard cases make bad law. Emergency dispatch involves hundreds of decisions per shift based on incomplete and often contradictory information, technological limitations in locating callers, and finite resources that must be allocated among competing needs.

{¶99} For these reasons, I would affirm the trial court's grant of summary judgment in its entirety. While Tiler Widdowson's death is undeniably tragic, and while the emergency response may not have been perfect, the legal standards governing this case do not permit liability under these circumstances.

Case No. 2025-L-038

# JUDGMENT ENTRY

For the reasons stated in the Opinion of this court, the assignments and cross-assignments of error are with merit to the extent indicated in the opinion. The order of this court is that the judgments of the Lake County Court of Common Pleas are affirmed in part and reversed in part. This matter is remanded for further proceedings consistent with this opinion.

Costs to be taxed against the parties equally.

_____
JUDGE SCOTT LYNCH

_____
JUDGE JOHN J. EKLUND,
concurs

_____
JUDGE EUGENE A. LUCCI,
concurs in part and dissents in part with a
Dissenting Opinion

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

Case No. 2025-L-038